(No. 5987.   July 6, 1933.)

ANNA FEALKA, Appellant, v. FEDERAL MINING & SMELTING COMPANY, Employer, and AETNA CAS-UALTY & SURETY COMPANY, Surety, Respondents.

[24 Pac. (2d) 325.]

Gray & McNaughton, for Appellant.

C. W. Beale and R. M. Cummins, for Respondents.

GIVENS, J.—Appellant, widow of John Fealka, applied for, and was by the Industrial Accident Board granted, compensation for the death of deceased, which award was on appeal to, set aside by, the district court, from which judgment this appeal is taken.

Respondents' motion to dismiss the appeal because of no certificates complying with secs. 11–213 and 11–216, I. C. A., and Rules 21 and 31 of this court, is not well taken, since the clerk's and trial judge's certificates are sufficient, enumerating the various parts of the record and stating that they were all considered by the trial court.

While orderly procedure requires that the record on appeal from the board to the district court should be complete, and so certified, the statute, sec. 43–1409, makes no specific provision therefor, but in the absence of any showing or contention that the record is incomplete, the certificate of the stenographic reporter for the board that the transcript of the evidence is full, true and correct is

sufficient as to that, and the clerk of the district court enumerates in detail a complete record, accompanied by the judge's certificate that such are all the papers, files, etc., considered by him, and thus there is presented to us a sufficient record to justify us in considering the appeal.· The motion to dismiss is therefore denied.

John Fealka was employed by respondent Federal Mining & Smelting Company to distribute steel throughout the mine, but on January 5, 1932, was ordered by a shift boss to help push some loaded ore cars from where they were loaded to the shaft.

There was evidence, though denied in part, that the track was out of shape and that one track was lower than the other, and the witness Levi testified that it was extremely difficult for him to push the cars alone, and that a shift boss had to help him with several of them, and he in turn helped the deceased. The deceased pushed the car alone for about two hours, and Levi helped him when he could push them no farther. It appears that the loaded car weighed approximately two or two and one-half tons. At one time the switch was not properly turned, and the car ran off the track, and they all (including deceased) worked to put it back. After deceased returned to his own work he was found talking in a foreign tongue, and acting queerly, and became unconscious, and a shift boss telephoned the top station to send the cage down, after which deceased was taken to the top of the mine, and over to an ambulance.

The death certificate was admitted without objection, and recited that the cause of death was cerebral hemorrhage, and Dr. Mowery, who made the certificate, testified when on the stand as follows:

"Q. Can you tell definitely, doctor, what was the cause of his death?

"A. I cannot. I don't think it would be possible under these circumstances, but I can state why I drew the conclusion that it was a cerebral hemorrhage, and I don't remember, but some of the men who were with him there said

that he had become violent and then subsided and that they had brought him down and that he kept getting more quiet all the time, and when I first went up to him there and felt that awful heat emanating from his body I immediately considered it a brain lesion of some type because we medical men all know that any lesion of the brain, in which there is some irritation to the thermal or temperature center, causes an excessive temperature of the body, and when I pulled his eyes open and saw that the pupils were unequal, and from the history that they gave me, I couldn't figure out any other thing except some brain lesion of that type, and from it coming on him the way it did it appeared to me that a cerebral hemorrhage was the most probable cause of his death.''

While Dr. Lewis testified about strain and its effects, he did not state that cerebral hemorrhage was not the cause of death, or that it was not caused by strain, though he indicated that a lighter strain would be more likely to cause a weakened or diseased blood vessel to break down, than a normal, healthy one.

Dr. Wood, in answer to a hypothetical question which fairly reflected appellant's theory of the evidence, stated that the strain would at least be a contributory cause of his (Fealka's) death, and on cross-examination stated that a strain would break a weakened blood vessel when it would be impossible to cause a hemorrhage in a normal vessel.

Respondents contend that death, though by cerebral hemorrhage, was natural. Appellant urges the strain as the immediate predisposing cause of the accident. The board found with appellant.

Conceding Fealka's blood vessels were weakened by disease or otherwise, that would not prevent recovery if the strain broke them down. The case is almost identical in principle and general situation with *In re Larson*, 48 Ida. 136, 146, 279 Pac. 1087, where the court said:

''The evidence is not seriously in dispute; neither do we think, after a fair and careful analysis of the expert testi-

mony, that the cause of the death of the deceased is in dispute. While his death may have been brought about as a result of the aneurism 'spreading farther than it had been before,' or may have resulted from vegetation breaking away from an aneurism, entering the blood stream and causing a cerebral embolism, either or both of these conditions occurred and were occasioned by reason of the work being done by deceased and the strain, however slight, incident thereto; an unexpected or untoward event. The expert for respondents testified:

" 'Now, this man lifted, and probably at that time tore a weak point in a diseased aorta, produced a dissecting aneurism, which later broke into the pericardial sac, of which that is a tab . . . . '

"When asked if exertion would not accelerate the aneurism more than normal activity, the witness answered in the affirmative. He further testified:

" 'And the pain at that time was probably due to the fact that the dissecting aneurism dissected a little farther at that time. Because when he lifted he complained of a stinging pain in the upper part of his chest, which ran upward. We know that to be a typical aortic pain, and the pain occurred when the blood dissected the two walls more, that is, the stinging pain.'

"It therefore seems clear that as a result of the work being performed by the deceased the latent physical defect, the aneurism, was accelerated or aggravated and progressed farther, causing death. The strain may not have been unusual, and even slight, but if it caused the death of the deceased it was an accident that is compensable."

There it was a weakened aorta, or the great artery forming the main trunk of the arterial circulation, which, previously weakened or diseased, ruptured under a strain.

■ Herein, so far as the record affirmatively discloses, a blood vessed in the head which weakened or not, broke under the strain, thus compensable, and the board properly allowed compensation.

Judgment reversed, with instructions to remand to the board for reinstatement of the award. Costs to appellant.

Budge, C. J., and Morgan, Holden and Wernette, JJ., concur.

Petition for rehearing denied.