## PETERSON v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5377.   Decided December 4, 1933.   (27 P. [2d.] 31.)

*P. E. Norseth* and *C. R. Hollingsworth,* both of Ogden, for plaintiff.

*Joseph Chez,* Atty. Gen., and *Grover A. Giles,* Deputy Atty. Gen., for defendants.

FOLLAND, Justice.

Plaintiff, the widow of Christian A. Peterson, applied to the Industrial Commission for compensation on account of the death of her husband following an operation for strangulated hernia. The commission, after a hearing, denied compensation, and the cause was brought to this court for review. The evidence, it is contended by plaintiff, was such as to require an award of compensation. The cause was submitted on evidence produced by the applicant; none having been offered on behalf of either the employer or the insurance carrier. The facts are not in dispute. The deceased was on February 4, 1932, in the employ of the Mutual Creamery Company at Ogden, Utah. He was 46 years of age, weighed 180 pounds, and was a strong, active man in good health. He had no previous hernia or ailment of a similar nature. On that day he with two other workmen was engaged from 8 o'clock a. m. to 12 noon in moving a glass-lined metal tank, 8 feet in diameter, 12 feet in height, and weighing about 5 tons, along the concrete floor of the creamery. The tank was being moved by means of steel rollers placed under it and shoved forward by steel pinch bars 6 feet in length. The bars would be placed under the edge of the tank, and lifted upward or pulled downward thereby

lifting the tank and pushing it forward on the rollers. This was hard work requiring much exertion and energy in pulling and lifting. At times the bars would slip causing strain or wrench to the bodies of the workmen. Each of the men handled and worked with one of these bars. At 12 o'clock Peterson said "It's noon, let's go to dinner." Peterson was an active man and quick in his movements but at this time instead of rising and moving quickly as was his custom he raised up from his work very slowly; his face was purple or bluish in color. He made no outcry of pain, nor, at the moment, any statement of having been injured. The other men left the place to go home for lunch. Peterson went over to a box about 12 or 14 feet away and sat down with his lunch box for the purpose of eating lunch. The food was later found out of the lunch box and with only a very small portion eaten. He was next discovered between 12:30 and 1 o'clock in his automobile, which was parked at the curb adjoining the creamery, sitting or lying in the back seat with his feet over the back of the front seat and calling for help. Leroy Richardson, an employee at the plant, was the first to reach him. Richardson found him in this position groaning and giving evidence of intense pain; that is, he was rolling about, his face was distorted, and was dark and unnatural in color. Michael Mickelsen, one of the men who worked with him on the tank, and Walter Levack, the foreman in charge of the particular job, both having returned from lunch, and before 1 o'clock, also went to the automobile and found Peterson in the condition stated. Mickelsen testified that at that time Peterson said he "must have lifted too hard and got a rupture." Peterson took his auto key out of his pocket and said, "Take me to a doctor or to the hospital." Richardson went to the office and had the girl telephone for a doctor, but was unable to locate one. Richardson thereupon drove the car to the hospital where Peterson was undressed and put to bed. Levack went with them, sitting in the back seat with Peterson. Richardson testified that on the way to the hospital Peterson said he

"was awfully sick and was going to die," and that he thought he had ruptured himself, and that while undressing Peterson he saw the rupture, a big bulge in the lower part of his abdomen. Dr. E. R. Dumke, who took charge of the case and with Dr. Eldon Clark performed the operation, testified he had known Peterson for years, had treated him previously, but not for hernia or rupture; that he never made complaint that he had a rupture. He examined the patient at the hospital and found he had a traumatic strangulated hernia about the size of a fist; that he was in a great deal of shock, had a rapid pulse, and his body was cold and clammy; that he was doubled up in pain so that he could be examined only with difficulty. The doctor at once ordered an operation, but it was about one-half hour before the patient could be gotten to the operating room. At that time the hernia had increased to the size of a baby's head. He testified that before the operation Peterson told him "he was working on a boiler, and was lifting on a boiler about five or ten minutes before he left work, and was lifting and felt this terrible pain and he went over and laid in his car and thought maybe if he laid down it would be all right," and that he could not eat his lunch. The operation disclosed: "We found he had a large thin sac filled with fluid. I should say there was a quart of blood in it, and the bowel had come down into the sac about a foot or a foot and a half of bowel had come down into the scrotum, and the bowel was fairly dark, but when we put hot packs on it it cleared up immediately. He went along nicely for five or six days and developed a paralytic ileus and we went inside, and we found he had paralytic ileus."

Death was due to obstruction by reason of the paralyzed ileus. The following hypothetical question was put to the doctor and answered as indicated:

"Q. If he was using a six-foot metal bar on the forenoon of this day and was moving a five-ton steel milk tank on steel rollers sliding on the concrete floor, moving it by Mr. Peterson and a fellow workman with these pinch bars taking a little bite under it, and moving it along bite by bite, and if during the doing of that work they would

get an insufficient bite on the bottom of the tank and would slip, would that in your opinion have caused this traumatic hernia? A. In my opinion any kind of pressure could have caused it, or strain.

"Q. Such as a slip when he would pull up on the pinch bar? A. Yes, sir."

The doctor also testified:

"Q. How recent was the trauma that caused the condition that you saw? A. If I ever saw a traumatic hernia in my life that was a typical traumatic hernia.

"Q. Immediately following a trauma? A. I could not tell when it started, but I would say it was very recent. * * *

"Q. Have you operated a number of strangulated hernias before? A. Yes.

"Q. Was this somewhat different than the others? A. This was a very severe strangulated hernia, more hemorrhage than the average case, and the thing that was different was the way the thing increased in size in a very short time."

It was stipulated that Dr. Eldon Clark would testify substantially the same as Dr. Dumke as to all facts disclosed commencing at the time Peterson reached the hospital. There was testimony of statements by Peterson made to his wife, to the manager of the creamery company, and to others, to the effect that he slipped and strained himself in lifting the bar when moving the boiler about five or ten minutes before he quit work at noon.

The finding of the commission is as follows:

"The applicant has failed to sustain by competent evidence her burden of proof to show that the death of the decedent herein named was caused either directly or indirectly by the accident complained of herein. There was no competent evidence to establish that the decedent met with an accident or that his death was the result of an accidental injury."

The commission concluded the applicant was not entitled to compensation, and so denied her claim.

The only question presented to the court is whether the applicant produced at the hearing sufficient competent evi-

dence of an accident in the course of employment as the cause of the hernia to justify an award of compensation. It was admitted that Peterson died as a result of the hernia. Most of the argument of counsel for both parties in their briefs is directed to the question of whether the statements of the deceased, to the various parties mentioned, as to slipping and straining himself shortly before noon, offend against the hearsay rule or were admissible and competent on the theory of res gestae. This question need not concern us as we are satisfied there is sufficient competent evidence of accidental injury without such statements. The manner in which he arose from his work, slowly instead of quickly as usual, the discolored appearance of his face at the time, the uneaten lunch left at the place where he attempted to eat it, the indications of severe pain and suffering when found in the automobile, and the rapidly developing hernia, are all mute facts pointing directly and logically to an accidental injury as the cause of his trouble. This conclusion is aided by the testimony of Dr. Dumke as to the nature and extent of the injury, and the fact of no previous symptoms of hernia or rupture. The declarations and statements made by the deceased to the physician, before operation, that he was lifting on a boiler five or ten minutes before he left work and while lifting felt "terrible pain" were admissible under the rule stated in 3 Jones Comm. on Evidence (2d Ed.) 2234, as follows:

"Where it appears that the physician testifying was called by the injured person in his ordinary professional capacity and for purposes of securing relief from pain and for medical treatment, and there are no circumstances casting suspicion on the genuineness of the utterance, all statements of symptoms and sufferings, whether past or present, and though involving statements as to the nature of the accident, if necessary to diagnosis by the physician, may be testified to by him. On the other hand, where a physician examines an injured person for the express purpose of testifying as to his physical condition, even declarations of present pain made by the patient to the physician have been held inadmissible."

Counsel for the commission say in their brief:

"In a number of well-considered cases the rule in hernia cases is laid down as follows: To establish the fact of hernia caused by accident arising out of the employment, it is necessary for the injured employee to show that the injury caused immediate disability by reason of the pain at the time of the accident. Where the accident is followed by a later development of hernia, the accident must usually be regarded as the occasion rather than the cause of the injury."

These conditions as to immediate disability are all met by the undisputed competent facts. The effect was immediate. It was no less immediate that deceased's condition grew progressively worse during the two hours between 12 o'clock noon and the time the operation was performed. All these facts were proved by unquestioned competent evidence. They do not at all rest on hearsay. The hearsay testimony, if it be hearsay, points alone to the same accidental cause without anything to raise even a suspicion of any other cause for Peterson's condition. The medical testimony indicated traumatic strangulated hernia of recent origin without anything to indicate any previous hernia or other predisposing cause.

That overexertion, or strain, or wrench, may cause accidental injury or death is not now open to serious question. *Graybar Electric, Inc.,* v. *Industrial Commission,* 73 Utah 568, 276 P. 161; *Cherdron Constr. Co.* v. *Simpkins,* 61 Utah 493, 214 P. 593; *McEwan* v. *Industrial Commission,* 61 Utah 585, 217 P. 690; *Fealka* v. *Federal M. & S. Co.* (Idaho) 24 P. (2d) 325.

The only reasonable or permissible inference from the evidence in this record is that the hernia was caused by strain or overexertion by the deceased while in the performance of his work moving the milk tank. Undoubtedly the applicant sustained the burden of proof. There is not anything in the record which would support a finding that the hernia was caused otherwise than by accident arising out of and in the course of employment.

The findings and decision of the commission are set aside, and the cause remanded for further proceedings.

STRAUP, C. J., ELIAS HANSEN, EPHRAIM HANSON, and MOFFAT, JJ., concur.