341 P.2d 215

Hal E. LEMMON, also known as Paul Gordon, Plaintiff and Respondent,

v.

DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, a corporation, Defendant and Appellant.

No. 8924.

Supreme Court of Utah.

June 12, 1959.

VanCott, Bagley, Cornwall & McCarthy, Clifford L. Ashton, Salt Lake City, for appellant.

Kunz & Kunz, Ogden, for respondent.

CROCKETT, Chief Justice.

Plaintiff, a switchman, sued for injuries to his back suffered in falling from the side of a boxcar when one of the iron ladder rungs (in railroad parlance a grab iron) collapsed. The action was brought under the Federal Safety Appliance,[1] and the Federal Employers' Liability Acts.[2] Plaintiff recovered jury verdict and judgment of $6,112.80 and defendant appeals. The principal errors assigned are in rulings on evidence and in giving certain instructions.

The facts leading up to the plaintiff's injury, including a long period of amnesia, involve one of the strangest narratives ever to come to our attention in a lawsuit. Some aspects of it certainly strain one's credulity. But the jury having elected to believe his evidence, upon review we look upon it in the light most favorable to him, and if there is substantial evidence to justify the verdict, we affirm it.

On August 29, 1955, plaintiff with his wife and two small children spent the morning picnicking at Liberty Park in Salt Lake City. That afternoon, after taking his fam-

1. 45 U.S.C.A. § 1 et seq.
2. 45 U.S.C.A. § 51 et seq.

ily home, he went for a hike in the high Wasatch Mountains immediately east of the city. He left his car parked near the foot of Mount Olympus, put his wallet on the front seat and went hiking up a trail. A short time later he slipped and fell. He claims to have no memory of anything thereafter until he found himself on a park bench in Grand Junction, Colorado, the next morning, with no knowledge of who he was and no identification to find out, with only vague memories of the past and two $10 bills he had by some premonition placed in his shirt pocket. He had a hazy recollection that he had worked for the Southern Pacific Railroad as a switchman. The facts are that he had worked for that company in Los Angeles from 1951 through 1953, and briefly for the Union Pacific Railroad in the same capacity later during 1953. He was discharged from the Union Pacific because x-ray pictures disclosed a malformation in the curvature of the lumbar area of his spine, indicating it would not stand the stress required in a switchman's job. Still later plaintiff worked briefly for the Denver and Rio Grande Railroad and for the Shell Oil Company in Salt Lake City. While employed at Shell plaintiff slipped on some stairs and was hospitalized for back injuries.

After buying himself some breakfast that morning in Grand Junction, plaintiff presented himself at the personnel office of the defendant railroad. He couldn't remember his real name and gave his interviewers his name as Paul R. Gordon. During the course of several interviews and in filling out questionnaires, plaintiff did not remember numerous facts. He stated that his sole dependents were two aged parents in Delta, Utah, omitting his wife and children; he recalled only his job with the Southern Pacific and forgot the intervening employment; he reported his last position as a self-employed farmer. In answer to questions about his medical history and specific questions about his back, he did not mention his back condition nor the back injury he had sustained at Shell Oil Company.

The defendant railroad hired plaintiff and put him to work as a switchman. After four days on the job, as he was attempting to hoist himself up the side of a boxcar, a grab iron gave way and he fell to the ground suffering the injuries complained of to his back. His foreman, Joseph Roff, was a short distance away and witnessed the incident. Plaintiff was treated in hospitals for some months and by several doctors, without much success. In February, 1956, after he had contacted his attorneys in Ogden, Utah, he was sent to that city. There he saw Dr. Charles Swindler, an orthopedic surgeon, who referred him to Dr. Hardin Branch, a psychiatrist. The latter had a series of consultations and performed various tests on him in an effort to "break through" his amnesia. Through the combined efforts of these doctors the

plaintiff's memory was largely restored, except what transpired in the 14 hours between the time he fell in the canyon to his awakening in Grand Junction.

In addition to the above-mentioned physicians, plaintiff saw two other orthopedists: A Dr. Thomas Bauman, of Salt Lake City, and later Dr. Penelope Sherwood of New York where he had gone to take a job. After diagnosis Dr. Sherwood performed an operation in July, 1957, to fuse the vertebrae causing the difficulty.

Two primary questions may be summarily dealt with: whether plaintiff was entitled to rights as an employee under the F.E.L.A.; and the question of negligence of the railroad.

■ The trial court instructed the jury that if they believed plaintiff made any material false representations which induced the railroad to hire him and without which it would not have done so he could not be considered an employee under the F.E.L.A. nor entitled to bring this action under it. It is apparent from the verdict that the jury accepted the plaintiff's theory that because of his amnesia condition he made no wilful falsifications. Likewise it found the railroad negligent because of the defective grab iron, which is classified as a safety appliance, so a defect therein is ipso facto negligence.[3] Since there is substantial evidence to support both of these findings the jury verdict is conclusive thereon.

■ More serious problems relate to the admission of evidence. It is claimed that the trial court erred in allowing Dr. Branch to testify to conversations had with the plaintiff. Defendant does not question that a physician may testify to statements made to him for the purpose of treatment,[4] but argues that a doctor cannot act simply as a conduit to relay into court a narrative told him by the plaintiff. The reasoning is that where a patient gives information to provide a basis for treatment there is greater motivation to tell the truth than where he is being examined for diagnosis only which may not affect the treatment he is to receive. A generally accepted cognate to the rule that a treating physician can testify to the patient's statements as to his symptoms and history is the rule allowing an expert witness to testify to the information upon which he has relied in forming an opinion.[5] This would permit the doctor to give an account not only of facts observed, but of the "history", including the patient's statements as to injury, past symptoms and present feelings as of the time of the ex-

---

3. 45 U.S.C.A. § 4; St. Joseph & G. I. Ry. Co. v. Moore, 243 U.S. 311, 37 S. Ct. 278, 61 L.Ed. 741; see also Ehalt v. McCarthy, 104 Utah 110, 138 P.2d 639.

4. McCormick, Evidence, Sec. 266 (1st Ed. 1954).

5. McCormick, Evidence, Sec. 267 (1st Ed. 1954).

amination.[6] When presented for this purpose the statements are not evidence of the matter stated, and hence not hearsay, but merely help to explain the opinion and enable the jury to weigh it in the light of this foundation.[7]

▮ The above rule being sound where the expert is giving his opinion regarding a physical injury, is at least equally so where a psychiatrist is testifying to a mental condition. Practically the only means by which he could form an opinion as to whether a patient were suffering from amnesia would be to question the patient thoroughly about himself and his experiences. Thus he applies his psychiatric knowledge in making his diagnosis and it is often also part of the process of treatment. This is the procedure Dr. Branch followed. Inasmuch as the patient's declarations were indicated as necessary to his opinion and constituted the basis for it, the evidence was admissible, not to establish the truth of such statements, but to show the foundation for the opinion. It is recognized that there is danger that such statements may be taken as evidence of the matters stated and also that being related by the doctor may give them an aura of authenticity beyond that of the original declarant. But this danger is present in a great deal of evidence which is hearsay when used for one purpose and not hearsay when used for another. However, the hazards therein are outweighed by the psychiatrist's need and obligation to demonstrate the foundation for his opinion so that the jury may intelligently evaluate it and may be guarded against by proper admonition to the jury as to the limited purpose for which the evidence is received, if a request is made that this be done, which was not done here.

▮ The same reasoning applies to the claimed error in allowing Dr. Branch to testify to "hearsay" statements of the plaintiff made while he was under the influence of sodium amytol, referred to as a "truth serum." He used it in an effort to "break through" plaintiff's amnesia by going into his subconscious for unremembered facts of his past life. Its sole purpose is to lessen inhibitions and reduce conscious controls so that any barriers to telling the full truth will be removed. In that situation it seems that there is less likelihood that a patient could contrive to feign amnesia or otherwise falsify than under normal circumstances. Consequently the possible evils of admitting the conversations are even less.

▮ A further error assigned in admitting the testimony of Dr. Branch relates to his supposed use of statements from others than the plaintiff in forming an opinion as to the plaintiff's condition, principally to those of plaintiff's wife regarding the fam-

6. Wigmore, Evidence, Sec. 655, 1720(1), (3d Ed.1940).

7. McCormick, Evidence, Sec. 267 (1st Ed. 1954).

ily background of her husband. Such statements would fall in the same category as those above discussed and in any event there are other reasons why no prejudicial error could be predicated thereon: This testimony was elicited from Dr. Branch by the trial judge and was of such an innocuous nature that it could have had no prejudicial effect upon the defendant's case.

With respect to the conversations elicited through the psychiatrist it is important to keep in mind that they did not relate to the critical issues as to negligence, nor to the cause or extent of the injury, but only to the question of amnesia and whether the plaintiff had in fact practiced a fraud upon the railroad in obtaining his employment.

■ Defendant's next attack upon the testimony of Dr. Branch makes an about-face from the charge that the conversations discussed above were inadmissible. The objection is now made that there was no sufficient foundation laid to permit him to give his opinion that plaintiff was a bona fide amnesia victim. The argument made fails to differentiate between a mental and a physical examination. In the latter the physician uses numerous tests which can be objectively considered and the results of which can be explained to the jury. In a mental examination and specifically in diagnosing amnesia such tests cannot be used.

As Dr. Branch put it: "In the psychiatric examination you use what you call interview technique, discuss all sorts of things * * * and try to get an appraisal * * * [of] * * * the kind of a person you are dealing with * * * and from these findings make your diagnosis." His opinion included the observation that he had learned sufficient of the patient upon which to base it. Inherent in the nature of our procedure is the necessity that the trial court have considerable latitude of discretion in determining whether there is a sufficient basis for the expert to state his opinion.[8]

■ Another major objection is made to the testimony of Dr. Penelope Sherwood, the orthopedic surgeon at New York who operated on plaintiff's back. Her deposition was taken there some months before the trial. In attendance were counsel for both sides including the same counsel who represented the defendant throughout this litigation and at the trial. Upon the basis of Dr. Sherwood's findings and what the plaintiff had told her, she stated that, "the condition which I found was the result of the accident of September 4, 1955." She further gave as her opinion that the injury had left the plaintiff with a permanent 10% disability. On cross-examination she admitted assuming that the plaintiff had had no prior back injury and that a showing of such an injury might modify her opinion. Defend-

8. Huffman v. Lindquist, 37 Cal.2d 465, 234 P.2d 34, 29 A.L.R.2d 485; see also Wigmore, Evidence, Sec. 561 (3d Ed.1940).

ant's counsel had full opportunity to explore her opinion and confront her with the assumption of a pre-existing condition in the plaintiff's back, and did so thoroughly. However, she was not shown the X-rays of the plaintiff's back taken prior to the injury. These X-rays were introduced at the trial, the only reason for which would have been to discredit Dr. Sherwood's testimony.

The defendant moved to strike her testimony, "relating to the cause of this particular condition" on the ground that it was based on a faulty assumption of no prior back injury. Her entire testimony, along with the x-rays, was before the jury and all aspects of the matter were fully exposed to them. The trial court correctly took the view that the claimed frailty in her testimony would not render it wholly incompetent, but would only affect the weight to be given it, which the defendant could and did argue to the jury. It is unnecessary to be concerned with plaintiff's contention that the defendant is precluded from attacking critical portions of her testimony because of the failure to make proper and timely objections thereto. The extent of any prior existing difficulty with the plaintiff's back, and the degree to which the accident in question injured and/or disabled him was properly submitted to the jury for their determination.

Defendant also assails the giving of an instruction that, "the plaintiff's right to recover, if any, is based on statutes of the United States and that statutes of the state of Utah are not applicable to this case." Moore v. Denver & R. G. W. RR. Co.[9] is cited as criticizing such an instruction. Plaintiff's argument is that some jurors may know about Workmen's Compensation and such an instruction is necessary to prevent any misunderstanding that plaintiff would be compensated from that source. The instruction is not inaccurate as to the law, but as was pointed out in the Moore case, it is not the function of the trial judge to tell the jury all the law that is *not* applicable to the case. If so, it could be done ad infinitum. The proper affirmative instruction was given: that the case was governed by the F.E.L.A., which should suffice. But the giving of the instruction under attack provides no ground for reversal.

The jury system may indeed have its faults. The complexities of human nature and behavior are such that, in regard to many conflicts that arise, no means have yet been devised of being certain of absolute truth or absolute justice. The best that can be done is to strive toward those ideals and to minimize the precentage of error. But the basic ideas of the system and its evolvement into our present method

9. 4 Utah 2d 255, 292 P.2d 849.

have been functioning quite well for some hundreds of years. So far as we are aware, it is the best system yet devised. Even if that were not so, whatever its advantages or its frailties, we are wedded to it and our loyalties are committed. One of its most fundamental tenets is that the determination of the facts is left exclusively to the jury. It is not our prerogative to let our suspicions or predilections obscure our duty to abide by that rule. The only limitation thereon is that if findings are made which are not supported by any substantial evidence, or the evidence is so clear that all reasonable minds would find one way, so that a verdict contrary thereto must have resulted from passion or prejudice, or misconception of the law or the evidence, or in arbitrary disregard thereof, the court will exercise its inherent supervisory powers to administer justice, and will set the verdict aside. As well stated by our eminent forebear on this court, Justice Frick:

"* * * if * * * the court is in doubt whether reasonable men * * * might arrive at different conclusions, then this very doubt determines the question to be one of fact for the jury and not one of law for the court." [10]

 It is regrettable that not all members of the court view the facts disclosed by the record as being in accord with what we think is a full and fair statement of them as reflected herein. The plaintiff's story of amnesia, including its incredible aspects, was presented to Dr. Branch, a psychiatrist with impressive credentials.[11] He accepted the plaintiff's story and diagnosed his amnesia as genuine. Upon conflicting evidence and contentions the disputed issues were fully and fairly presented to the jury. The verdict has been given some additional verity by the rulings of the trial court on motions presented, including the motion for a new trial. When such a trial has been had, the presumptions are in favor of validity of the judgment entered. This court is loathe to disturb it and will not do so unless the appellant meets its burden of showing error and prejudice which deprived it of a fair trial. We are not persuaded that it did so here.

Affirmed. Costs to plaintiff (respondent).

WADE and McDONOUGH, JJ., concur.

WORTHEN, J., heard the argument but died before opinion was filed.

HENRIOD, Justice.

10. Newton v. Oregon Short Line RR. Co., 43 Utah 219, 134 P. 567, 570, quoted in Stickle v. Union P. RR. Co., 122 Utah 477, 251 P.2d 867. See the latter case for statement re safeguarding trial by jury.

11. Head of the Department of Psychiatry at the University of Utah Medical School; various other qualifications including many years of practice.

I dissent. In doing so I heartily join the majority opinion's observation that the facts of this case "involve one of the strangest narratives ever to come to our attention in a lawsuit," but not much stranger than the verdict in this case itself. I again agree that "some aspects of it certainly strain one's credulity." In the next breath the main opinion seems to indulge in an implied non sequitur that the evidence was not weak when it says that "if there is substantial evidence to justify the verdict we affirm it,"—which is done here.

I believe that even taking the facts recited in the main opinion, to expect a tribunal to believe the tale spun by plaintiff calls for an optimism this writer cannot share. The fantasy here is emphasized by the inescapable deductions and facts which either are omitted by the decision or watered down so as to minimize the absurdity of this case.

A fair resumé of the evidence that either is admitted or by which plaintiff is bound, is as follows:

From 1951–53, plaintiff was a switchman for the Southern Pacific in Los Angeles. He moved to Salt Lake where in 1953 he worked a short time for Union Pacific, until x-rays proved he had a back injury identical to that for which he claims damages in this case. He was discharged for that reason. Later, for a short time, he worked for this defendant, but was let out.

He then worked for Shell Oil, where he slipped on some stairs, claimed a back injury that x-rays showed were identical to that for which he claimed damages in this case. After being hospitalized for a time, and after receiving compensation for the injury, he was discharged.

On August 29, 1955, on a Monday morning (an unusual day and time for picnics), he and his wife and children picnicked at a local park. That afternoon, alone, he drove to a canyon east of Salt Lake, parked his car and, so plaintiff says, *left his wallet with all of his identification therein, on the seat of his car,* at the mercy of thieves. He hiked up the mountain where he ate half of a lunch he had taken with him, resumed his hike, fell off the trail, blacked out. Strangely enough he had two ten dollar bills tucked away in his shirt pocket. The psychiatrist called by plaintiff, asked to account for this strange coincidence, said that plaintiff had a premonition he was going to have amnesia. It is quite amazing that although he had a premonition he was going to have amnesia, resulting in preserving the $20, he left the only means of identification that would have protected himself against such aberration, and the only thing that would have provided a quick means for returning him to his home, —*on the seat of his automobile.* Fantastic!

About 14 hours later, *he remembers,* he found himself in Grand Junction, Colorado, a convenient railroad town, on a park

206

bench. Not so convenient, however as the cerebration that inhibited him from recollecting how he got from an isolated mountain retreat in Utah several hundred miles away, to a Grand Junction, Colorado bench in 14 hours. A "break through" that would have restored his memory as it did with respect to everything else, so that he might have recounted the facts and circumstances of that forgotten jaunt, may have been most revealing, but that is now lost to this case and perhaps to the ages. Apparently hunger caused him to discover two convenient ten dollar bills in his shirt pocket, with part of which he bought a meal and some work clothes. He applied at the railroad for a job as switchman, and filled out a written form wherein he said his name was Paul R. Gordon, which, of course, was false, the fountainhead of such appellation being quite as mysteriously obscure as this whole affair. Besides giving a phony name, plaintiff said he was born in Delta, Utah, also false, he first having seen the light of day in Salt Lake City. He stated he had worked for the Southern Pacific in Los Angeles, and had gone to a Southern California university, but forgot to state that he had worked for the Union Pacific and also that he had worked for this very defendant,—it being quite obvious that had he remembered *this* important event in his life, his alias could have been discovered in a matter of hours. As to the university he attended in California, he testi-

fied as to one well-known institution and on cross-examination admitted he had gone to a different well-known school,—this, after his memory had been restored completely. He wrote down that his dependents were two aged parents, the true facts being that he was correct about having the parents, but quite incorrect as to dependency, his wife and two children, whom he claims he forgot entirely, actually being his dependents. He added that he was single, an error made by plaintiff born of a claimed amnesia condition that many others might enjoy suffering. His amnesia put him in the subsidized farmer group in which he apparently wished to be numbered, with respect to previous professional activities, a fact far removed from wrangling freight cars or tearing Denver telephone directories in two, which he significantly boasted he was capable of doing because there was a "trick" to it. With assurance he said that never before had he been examined for a back injury, never had he had a back injury or ache, and that he had no back ache then. Difficult it is to determine how, by means of any kind of psychiatric or medical syllogistic reasoning, amnesia could be anaesthesia for a sore back. This all seems quite phantasmal, since there was a seriatim history of back injury long before the Grand Junction episode.

Several times on direct and cross-examination plaintiff said he did not know who

he was and that he did not know his statements in the application were false, but on cross-examination he either made a slip of the tongue or again became plagued with amnesia when, in answer to the question "It didn't concern you to give false information?", he responded: *I needed a job*," and again in response to a query "The fact you were giving false information didn't concern you?", he answered: *"I was just interested in getting a job,"* and again on cross-examination, in explaining statements made on his report given to the doctor, plaintiff said *"I knew they weren't true."* To bolster the fact that plaintiff knowingly made false statements, the psychiatrist upon whom plaintiff's case so largely depended, testified that *plaintiff's amnesia did not prevent him from knowing his answers were false when he applied for employment with defendant.* The psychiatrist's explanation of all this, which, of course, in no way changed the fact that plaintiff *knowingly falsified the facts,* was that plaintiff apparently had a "blissful indifference" to whether he told the truth or not. It is suggested that such "blissful indifference" is symptomatic of everyone whose reverence for the truth is lacking, and of all earnest and well-meaning prevaricators. *Such "blissful indifference" for the truth is the very thing that the Federal Employers' Liability Act says will constitute a defense to an action for injury under that legislation.*

With such evidence before the jury, it is inconceivable that it did anything else in this case except espouse the "deep pocket" philosophy of abandoning reason in the interest of requiring one with means to compensate an injured person irrespective of any obligation to do so,—and the eulogy indulged by the main opinion on behalf of the jury system neither makes that system infallible, does not justify making something wrong right, and does not justify imposition of liability on one where none exists.

As though what had gone before was not enough to demonstrate the foible and fantasy of this fable, the veniremen most certainly should have taken off the blindfolds and the ear-muffs when it was revealed to them, without contradiction, that after the plaintiff had recovered his memory in full, and after he had commenced this litigation, he went to New York and told a surgeon who operated on him later, that he had been injured at Grand Junction and *that his back was healthy and normal prior to that time.* One wonders how far a person might go in turning amnesia on and off at his pleasure and convenience, or by indulging in a "blissful indifference" for the truth.

In my opinion, from the admissions made by plaintiff and canvassing the uncontradicted evidence of falsity in this case, a defense under the F.E.L.A. existed as a matter of law, and the ipse dixit of the

main opinion to the effect that there was *substantial* evidence to support the verdict in this respect, is not borne out even by the recitation of the facts reposed in the main opinion.

As to the main opinion's rejection of defendant's contention that it was error to permit the psychiatrist to testify as to statements given to him by plaintiff who did not employ the psychiatrist for treatment, but only to have him testify at the trial, such rejection is based on references to McCormick on Evidence to the effect that a medical man sought out, not for treatment, but to testify, may testify as to the "history" stated by the patient, to "explain" the doctor's "opinion,"—not to attest to the truth of the facts repeated to him. This part of the main opinion is a gratuity, not urged by the plaintiff, since, as is shown in the brief, the plaintiff goes the full way and claims that the psychiatrist "treated" plaintiff, and that therefore plaintiff's statements, though hearsay, were an exception to the rule. This is evident from the opening paragraph of plaintiff's brief, relating to this phase of the case, where he says "It is earnestly contended that, as a matter of fact, the respondent was *treated* by Dr. Branch," and that "under these circumstances it is fair and reasonable to consider the procedures utilized by the psychiatrist in accomplishing this 'break through' of the amnesia as 'treatment.' "

Hence, the plaintiff's contention that he was "treated" is gratuitously evaded, but aided, by the main opinion's dissertation on and application hereto of a rule not claimed by plaintiff. The very' authority cited by the main opinion in disposing of defendant's contention clearly indicates that if such statements are given to explain the opinion, the jury should be instructed not to consider the "history" as evidence of the facts recounted. No such instruction was given in this case.

The true rule, where the patient does not seek the medical witness for treatment has been resolved by this court in Peterson v. Industrial Commission [1] where it was said:

> "Where it appears that the physician testifying was called by the injured person in his ordinary professional capacity and *for purposes of securing relief from pain and for medical treatment,* and there are no circumstances casting suspicion on the genuineness of the utterance, all statements of symptoms and sufferings, whether past or present, and though involving statements as to the nature of the accident, if necessary to diagnosis by the physician, may be testified to by him. On the other hand, where a physician examines an injured person *for the express purpose of testifying* as to his physical condition, even declarations of present pain made by the patient to

---

1. 83 Utah 94, 27 P.2d 31, 33.

the physician have been held inadmissible." [2]

As to the main opinion's treatment of the defendant's contention that it was error to instruct that the laws of Utah were not applicable to this case, it seems to me that the author of the main opinion simply is reiterating in this decision the views he expressed in his "concurring in the result" opinion in Moore v. Denver & R. G. W. RR. [4 Utah 2d 255, 292 P.2d 852] which concurrence, in my opinion, and so far as the question here is concerned, should have been labeled and treated as a dissent. The fact that Mr. Justice CROCKETT said in that case that the main opinion practically conceded that the instruction would not have been reversible error, does violence to what the main opinion did say, and is a gratuity inferring that the main opinion there was talking just to hear itself talk. If that opinion hadn't meant what it said this writer may have resolved his action thereon differently. I can find nothing therein that makes any such concession as Mr. Justice CROCKETT asserts, but I *do* find the following, which is clear, unambiguous, emphatic and decisive:

"Two instructions, requested by respondent, were given the jury, although they are outside the issues of the trial. There is no question but that the statements of law contained in each were correct, but this court has held that where the instruction is extraneous to the issues and evidence in the case it is error for the trial court to give it. Parker v. Bamberger, 100 Utah 361, 116 P.2d 425. Instruction No. 12 charged the jury:

" 'That at the time of the occurrence involved in this case, plaintiff, Alfred Roger Moore, and defendant were mutually engaged in interstate commerce.

" 'Under such circumstances the statutes of the States of Utah and Colorado covering employers' liability and workmen's compensation are not applicable to this case and plaintiff's right to recover, if any he has, is based solely on the Statutes of the United States covering the liability of common carriers by railroad to their employees for injuries caused while in the course of their employment.'

"Respondent's counsel informs us that in many cases where he has represented plaintiffs in F.E.L.A. cases, members of the jury have asked him why his client has not pursued his remedy under the Workmen's Compensation Law, U.C.A.1953, 35–1–1 et seq., and that it was to prevent prejudice in the jury's estimation of his client that

2. See also United States v. Nickle, 8 Cir., 60 F.2d 372; 20 Am.Jur. 529, Sec. 624, McCormick, Sec. 267.

he requested this instruction. It is obvious that an attempt to exclude all possible considerations from the individual thinking of the jurors which may influence the verdict would be an impossible task and result in instructions so numerous that the only result could be complete confusion. A similar instruction to this was discussed in the case of Bruner v. McCarthy, 105 Utah 399, 142 P.2d 649, the court stating that the source of the law was not necessarily a concern of the jury." [4 Utah 2d 255, 292 P.2d 851].

The case should be remanded for a new trial.