469 P.2d 504

Carolyn J. WIESE, Plaintiff and Appellant,

v.

Robert D. WIESE, Defendant and Respondent.

No. 11823.

Supreme Court of Utah.

May 8, 1970.

Robert B. Hansen, Salt Lake City, Sheldon A. Vincent, Ogden, for plaintiff and appellant.

Robert L. Newey, of Lamph, Newey & Taylor, Ogden, for defendant and respondent.

ELLETT, Justice:

In March of 1967 the plaintiff herein obtained a divorce from the defendant based upon grounds of mental cruelty. At that time they had three children whose names and ages were as follows: Kurt, 10 years; Janice, 8½ years; and Michael, 5 years. The parties entered into a stipulation which among other things provided for a split custody arrangement whereby Janice would be with her mother, and the two boys with their father. The trial court ac-

cepted the stipulation as being fair and reasonable, but he wisely provided in the decree that the court would "reserve jurisdiction regarding custody of the minor children, subject to further hearing in the event either party make a showing that the present custody arrangements are not in the best interest of said children."

The plaintiff filed a petition to amend the original decree and to award to her the custody of the two boys. The trial court denied the petition, and she has appealed to this court from that ruling.

■ This is an equitable matter, and upon appeal the binding effect of the findings made by the trial court differs from that in a law matter. We may here review questions of both law and fact; and after making due allowance for the advantaged position of the trial judge to observe the demeanor of witnesses upon the stand, we may be persuaded that a finding is against the preponderance of the evidence to such an extent that we would be justified in disapproving it or even in making a finding of our own. Martinett v. Martinett, 8 Utah 2d 202, 331 P.2d 821 (1958); Wilson v. Wilson, 5 Utah 2d 79, 296 P.2d 977 (1956); MacDonald v. MacDonald, 120 Utah 573, 236 P.2d 1066 (1951); Jensen v. Howell, 75 Utah 64, 282 P. 1034 (1929).

At the time of the hearing on the petition the trial court made findings which in substance insofar as material are as follows:

(a) The plaintiff had unreasonably harassed defendant regarding visitation and custody of the minor boys.

(b) The plaintiff and her present husband took the two boys to a clinical psychologist without the knowledge or consent of the defendant.

(c) The plaintiff had attempted to undermine the relationship of the two boys with their father.

(d) The older boy had elected to remain in the custody of the defendant.

(e) The best interest of the boys would lie in their remaining with their father.

■ The last paragraph is a conclusion and must be based upon the other findings. The first finding numbered (a) above is immaterial to the welfare of the children. In passing it should be noted that the defendant changed his phone to an unlisted number so the plaintiff could not call her sons and talk to them. It is only natural to expect that she would make some effort to talk with her sons.

■ The plaintiff took her boys to Dr. Liebroder, a clinical psychologist, when it appeared to her that they might be in need of assistance. Later the defendant had the boys examined by a psychiatrist who sent them to Dr. Swaner, a clinical psychologist, for an examination and report. From

the report and testimony of the psychologists, as hereafter referred to, it appears that the plaintiff acted wisely and in the best interest of the boys in having them examined. The fact that she did not first get the consent of the defendant is of no great moment.

The evidence does not support the finding that the plaintiff had attempted to undermine the relationship of the two boys with their father. It seems to us that the plaintiff has at all times appeared to look out for the welfare of the children. It is the defendant himself who has attempted to poison the minds of the boys against their mother. The evidence would require a finding that he had told Kurt that his mother was mentally unbalanced, an immoral woman who took dope and who took him (Kurt) to see Dr. Liebroder in order to prove him crazy so she could get custody of Michael.

While it is true that Kurt told the judge he preferred to remain with the defendant, it is also true that Michael said he wanted to live with his mother. Neither child can bind the court by indicating a preference. The desire of the child is merely one of the factors to be considered in making a determination of the custody which will be for his best interest.

Let us look at the evidence which came from the two clinical psychologists, one of which (Dr. Liebroder) was hired by the plaintiff, and the other (Dr. Swaner) by the defendant. Their findings did not conflict. Dr. Liebroder found that Michael indicated a feeling of depression, emotional turmoil, conflict, anxiety, and unsatisfied nurturant needs, i. e., needs which are usually satisfied by a mother. The doctor further testified that where there is a significant gap in a person's development, a load of needs which are unfulfilled, they do not disappear but remain and become expressed in some rather unwholesome ways; that a child deprived of certain kinds of important or key experiences may spend the rest of his life trying to seek those out. He further said that the absence of a maternal figure can result in considerable damage later on, and that the effects if prolonged cannot be reversed by any known treatment.

Dr. Swaner testified that Michael needed to associate and be identified with a significant mother figure.

Dr. Liebroder testified that during the examination Kurt expressed considerable concern about the welfare of his little brother, Michael. He further testified that Kurt felt the examination was instituted by his mother to prove that he was crazy, all as a part of her attempt to gain control of Michael. The doctor further said that Kurt revealed that he had been plagued by questions concerning his mother's mental and moral conduct; that he indicated that he had been told that his mother had been

maintaining an illicit relationship with a man in California, and that she had been taking drugs. He said that Kurt then said:

I found out that she isn't having problems like I thought at first. I thought that she had been taking drugs * * *. I have been told lies. That is what has been separating me from my mother.

Regarding living with the plaintiff, he told the doctor:

I'd have a mother to come home to. I've been missing that since the divorce.

He said Kurt had difficulty in making friends and indicated that the best chances of helping him were to make the father and stepmother more aware of, and attentive to, the problems. (Both the father and stepmother worked and left home early in the morning.)

Dr. Swaner found Kurt to be a very intelligent lad, but with emotional disturbances reflecting insecurity, and he recommended psychiatric treatment. He testified that it is important for a boy of Kurt's age to have a mother figure in relationship to those whom he is around.

During the prolonged hearing the stepmother divorced the defendant and the home life of the two boys has worsened as a result thereof. The defendant leaves for work early and takes Michael with him to the home of his parents where Michael is given breakfast and then sent to a school to which none of his little friends go. Kurt often prepares his own breakfast.

The defendant can offer no better arrangement for keeping the two boys unless, as he testified:

I've thought about several approaches, and checked them out. * * * I checked a nursery school arrangement.

As opposed to this the plaintiff is happily married to a man with a good salary. She no longer works but spends all of her time as a homemaker and mother. She and her present husband live in a good and adequate home in a smog-free area of Southern California. Both plaintiff and her present husband were examined by Dr. Brown, a clinical psychologist, who testified that the plaintiff was, and is, able to assess real life situations very soundly, and that she is a capable and adequate person. He further testified that the chances of a dissolution of the marriage relationship between her and her present husband would be minimal due to the way they are working at and gaining an understanding of that relationship.

It therefore seems to us that Kurt's best welfare lies in being placed in the custody of his mother. We have arrived at this conclusion despite the fact that he has indicated a preference to remain with his father. Since the divorce, Kurt has not known the joys of family life. An association with his mother, his sister, and his

brother in an environment of mutual attention and love will undoubtedly give a joy to him which for so long he has been denied.

Little Michael wants to be with his mother. The grandparents with whom he spends most of his time are aged and not in the best of health. He needs the love and affection of his mother, and it seems to us that it would be a tragic mistake to leave him in his present situation.

It seems that in seeking to hold the custody of his boys the defendant has exhibited a great bitterness toward the plaintiff and has done serious harm to his children as a result thereof.

It is to be hoped that both parents will exercise restraint upon any feelings of animosity which they may have for the other and that they each will work for the welfare and happiness of their children in the future, and particularly so in relation to visiting rights of the noncustodial parent.

We reverse the trial court and direct that an order be entered granting custody of the children to the plaintiff, with reasonable rights of visitation afforded the defendant. If the parties cannot agree upon what is reasonable then the trial court might consider a period of one month for Janice and Michael and a period of two months for Kurt to be selected by the defendant during the summer when school is in recess, together with a week

every other Christmas. The trial court should also fix the support money to be paid and the question of travel expenses in case an agreement cannot be had by the parties on these matters. The trial court should also award such costs to the plaintiff as may seem fair and equitable, in view of the financial condition of the defendant.

CROCKETT, C. J., and TUCKETT, J., concurs.

HENRIOD, Justice. Dissenting:

The generalizations of the third paragraph of the main opinion are not objectionable but they do not have application to the facts and record of this case, in my opinion. They are platitudes that unrealistically are not supportive of the preponderance of the evidence, and in rendering lip service thereto, it seems to me, is a myopic appraisal of the findings of fact of not only one, but two district court judges, and they do not take into account what the main opinion claims we should do,—give due "allowance for the advantaged position of the trial judge." Using such gratuities does not change the adduced facts, and it is submitted that the main opinion does not even pay a fair degree of homage to the many cases we have decided heretofore leading to our case of Stanley v. Stanley, 97 Utah 520, 94 P.2d 465 (1939), and cited therein, and the many following that deci-

**242**

sion, as reflected by a casual perusal of the Shepard's Citations. The author there stated that "The scope of the review on appeal in equity cases is clearly settled in this jurisdiction," in Olivero v. Eleganti, 61 Utah 475, 214 P. 313 (1923), which said "This court is authorized by the state Constitution to review the findings of the trial courts in equity cases, but the findings of the trial courts on *conflicting evidence* [1] will *not* be set aside unless it manifestly appears that the court has *misapplied proven facts* [2] or made findings *clearly against the weight of the evidence.*" [3] The record in this case simply does not warrant a reversal under such a rule. [4] There is an abundance of believable, competent and substantial evidence here requiring affirmance under the rule.

Before pointing out some aspects of this case calling for affirmance of the trial court under established principles of appellate review, it is noted that the main opinion leans heavily,—to the extent of over half thereof,—on a series of testimonial psychosynthetic gratuities about the mother figure,—a technique frequently unhelpful to the trial court and frequently as controversion-ridden as the splenic ephithets

tossed at each other by the erstwhile soul mates in the subject litigation. It is remindful of the psychiatric testimony in Lemmon v. Denver & R. G. W. R. Co., 9 Utah 2d 195, 341 P.2d 215 (1959), that explained one's deliberate leaving his wallet and only means of identification on the seat of his car as evidencing a premonition that he was going to have amnesia, when he disappeared from Utah into the wilds of Colorado.

Here are only a few of the facts reflected in the record that lead me to conclude that it would be error for this court to reverse the judgment of the trial court:

The main opinion, in its first paragraph, after conceding that the appellant stipulated in the divorce action that the respondent should have the custody of the two boys, that this court now takes away from him in the face of the trial court's studied decision otherwise, said that the trial judge in the divorce proceeding, the Hon. John F. Wahlquist, "wisely provided in the decree that the court would 'reserve jurisdiction regarding custody of the minor children, subject to further hearing in the event either party make a showing that the present custody arrangements are not in

---

1. *Most certainly* the case here.
2. Most certainly *not* the case here.
3. Also, most certainly *not* the case here.
4. In a concurring opinion in the Stanley case, Justice Wolfe elaborated on the rule by saying: "I opine that what was really meant [in the many previous cases

cited] was that on review we would go over the record to determine what our conclusions of fact were from the transcript of the evidence, and if at the end of that investigation we were in doubt or even if there might be a slight preponderance in our minds against the trial court's conclusions, we would affirm."

the best interest of said children.'" This was dated March 10, 1967. Less than a year later, on January 28, 1968, the appellant, by petition, asked that because of changed circumstances she be awarded the custody of the younger of the two boys in addition to the minor girl who previously had been awarded to her. This same "wise" judge accommodated her by issuing an order to show cause why she should not be awarded the relief prayed for and the decree modified accordingly. After respondent filed a counter pleading, a hearing was had and on April 22, 1968, the same wise judge found that:

> "The natural mother is more capable than the average person, is further more easily upset than the average person and has less emotional strength than the average" and "that the plaintiff has less than average interest in her own children, as demonstrated by her reaction to visitation and pickup" and "that the plaintiff is not absent these qualities but less than average in them and markedly so" and that "The Court finds the plaintiff is warm, but that her affections for her children are not real and her description is basically one that she wants the children because the children are qualities rather than because the children are children." Plaintiff's petition was denied.

Plaintiff appealed the wise judge's decision to this court on May 16, 1968, Case No. 11269, and after this court sent her counsel a letter stating she was in default in filing her brief, she stipulated with the other side that the appeal could be dismissed, and we accommodated her by dismissing it on August 8, 1968. This was about three months after her appeal. Previously she had remarried one Thomas D. Harrison in New York on July 20, 1968, giving her home not only a mother figure, but a father figure, which latter figure the respondent herein, rather fiendishly but constantly insisted on calling "Tweetie Pie,"—even on Christmas.

Undaunted by her previous reversals she either voluntarily or by encouragement of her new protector, filed another petition on October 28, 1968, this time on the same grounds,—change in circumstances,—with some gratuitous and rather uncomplimentary aspersions about her ex-husband's usefulness while still breathing. This time, however, she shot the works and asked for full custody of both the boys, because, she suggested, of a newborn warm family association not existing theretofore. One cannot deny that she may have attributed this millenium to the happy New York union three months before to him whose significance was not shared by a previous him who did not hesitate to christen his tormentor with an unusual appellation.

Judge Wahlquist again accommodated appellant by signing an order to show cause why her petition should not be grant-

ed, dated October 26, 1968, setting the hearing thereon for November 12, 1968. After obtaining the signature of Judge Wahlquist on the order to show cause, and only *five days thereafter,* the plaintiff signed and filed an affidavit stating that she believed the judge was biased and prejudiced, for the purpose of getting another judge to hear the case. The wise judge wisely manoeuvred the case out of his court, and the hearing to change custody emerged out of a deluge of other motions, requests for admissions and interrogatories initiated by appellant, finally winding up in the courtroom of Judge Wahlquist's colleague, the Hon. Parley E. Norseth. After several hearings, continuances and about 400 pages later, on August 4, 1969, Judge Norseth found that Mr. Harrison, appellant's new husband, in June 1968, *before he had married appellant,* went to defendant's home and advised him he was handling appellant's visitation rights, and took the boys to California, where appellant was living; that prior to his marriage to appellant, he harassed defendant while the latter was on temporary military duty with purported emergency calls and telegrams, requiring defendant to be called from field duty, the calls having to do with custody of the boys, and took them to a psychiatrist without defendant's consent; that the elder boy, out of the presence of the parties said he wanted to stay with his natural father; that appellant and Harrison sought to get the boys to request a change in their custody by promise of gifts; that such constant attempts were not in the best interest of the boys; that plaintiff by constant long-distance telephone calls to the boys placed them under great emotional pressure; that defendant has properly supervised the boys and that the boys should remain in the custody of defendant subject to reasonable visitation rights, and that plaintiff should have them in August of each year; that Harrison be restrained from harassing defendant with calls and telegrams and from interfering with the order of the court; and that plaintiff should also have the boys during the Christmas holidays.

Time and space prevent detailing this voluminous record further. Nevertheless it is replete with motion after motion after motion filed by appellant, all costly to meet, punctuated with execution against defendant's salary, interrogatories, etc., almost ad infinitum, none of which resulted in impressing two district judges, whose judgments this court now destroys after two years' litigation. Appellant after her motion to obtain the younger boy was denied, returned to California without even seeing him, failed to write her children or show any interest until June 1968, 15 months after the divorce. Thereafter she swamped the boys and defendant with calls and telegrams, recorded a long-distance conversation with defendant on Christmas,

that from the record, in my opinion obviously was suggested and accomplished on advice of somebody or other, and sent her boy friend, who later became her husband to pick up and deliver the boys he had never seen, who explained his agency on the grounds plaintiff was emotionally unable to do so. Harrison dealt with the lawyers and psychologists without defendant's consent, in an attempt to effect a change in custody. In a secret code, such puerile phrases as "Casual Cat" were used by the Harrisons in letters to the boys apparently for purposes of deception. These are only a few parts of the controversial record, steeped in hate and heated by the unwilling bodies and souls of two little boys.

There is no question in my mind that both of the trial judges' identical conclusions with respect to the custody of these boys should not be junked now because this court, in interpreting a rule of appellate review in equity cases, takes upon itself to say that manifestly it appears that two arbiters of the facts, in concluding as they did, on conflicting evidence, misapplied proven facts or made findings clearly against the weight of the evidence. To do so, in my opinion, is a "manifest" reflection upon the integrity and intelligence of two of our learned jurists and no kudo for our own superiority in deciding domestic difficulties that largely should be disposed of on the real firing line,—the trial court level.

The trial court should be affirmed.

CALLISTER, J., concurs in the dissenting opinion of HENRIOD, J.