The STATE of Utah, Plaintiff
and Respondent,

v.

Frances B. SCHREUDER, Defendant
and Appellant,

No. 19588.

Supreme Court of Utah.

Aug. 15, 1986.

Rehearing Denied Oct. 14, 1986.

Ronald J. Yengich, Salt Lake City, for defendant and appellant.

Kevin J. Kurumada, David L. Wilkinson, Atty. Gen., Sandra L. Sjogren, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Defendant appeals her conviction by a jury of first degree murder, a capital felony. U.C.A., 1953, § 76–5–202 (Repl. Vol. 8B 1978 ed.) (current version at Supp.1986). Defendant was sentenced to life imprisonment. We affirm.

At about 7:30 a.m., on July 23, 1978, in the warehouse of his automotive parts business, Franklin Bradshaw was shot and killed by his grandson, Marc Schreuder. Marc was convicted of second degree murder for the homicide. Frances B. Schreuder, Marc's mother and Bradshaw's daughter, was charged with having knowingly and intentionally caused Bradshaw's death for pecuniary or other personal gain. U.C.A., 1953, § 76–5–202(1)(f) (Repl. Vol. 8B 1978 ed.) (amended 1983).

Defendant and Bradshaw had often argued over money. At one time, defendant was receiving $3,000 each month from Bradshaw, but this support had gradually dwindled. Divorced from her second husband and unemployed, defendant had told Marc that killing Bradshaw was the only way of assuring there would be funds to support the family.

In the summer of 1977, Marc and his brother Larry came to Salt Lake City and worked for Bradshaw at the automotive parts business. Defendant instructed her sons to kill Bradshaw and gave them amphetamines to put in Bradshaw's food to cause a heart attack. Defendant also made other plans for her sons to kill Bradshaw, including setting fire to his warehouse while he was inside and throwing an electrical appliance in the bathtub while he was taking his bath. None of the murder plans were attempted that summer.

Defendant further instructed her sons to steal money for her from Bradshaw. The

brothers stole around $200,000 in stocks, checks, and cash and sent it to defendant. Bradshaw discovered the thefts and cut off all financial assistance to defendant.

When Marc returned to New York City in September 1977, defendant asked him to give her some photographs he had taken while in Salt Lake City so that she could give them to Myles Manning, an individual she had hired to kill Bradshaw. Defendant had met Manning through Richard Behrens, a long-time friend who lived near the Schreuders in New York City. Defendant had paid Manning $5,000 to commit the murder. In February or March 1978, after defendant discovered that Manning had not carried out the murder, defendant told Marc she was going to hire another hit man from out of state.

Defendant asked both Marc and Behrens to obtain a gun with which to kill Bradshaw. Defendant also attempted to obtain a gun, inquiring at a rifle store in New York City and buying stacks of gun magazines. Ultimately, Marc arranged to buy a gun from Jon Cavenaugh, a friend who lived in Midland, Texas. Defendant obtained Cavenaugh's address, father's name, and phone number and gave the information to Marc. In late June or early July 1978, Marc telephoned Cavenaugh from New York City and asked about getting a gun. As Marc spoke to Cavenaugh, defendant wrote notes on a yellow legal pad instructing Marc what to say.

Defendant gave Marc some money obtained from Berenice Bradshaw, defendant's mother, to fly from New York City to Texas, to Salt Lake City, and back to New York. In order to divert suspicion, defendant made the airline ticket reservations using the name of Marc's brother, Lorenzo Gentile (Larry), who was then in Salt Lake City.

Around July 18, 1978, Marc flew to Midland, Texas, and stayed with Cavenaugh. On Saturday, July 22, Marc bought a .357 magnum and some bullets in Midland and flew to Salt Lake City. Marc took a taxi cab from the airport to a hotel, the address of which defendant had provided him. That night, Marc called defendant and told her he had the gun, but that he did not want to go through with the killing. Defendant became hysterical and told Marc, "If you don't do it, don't come home again." Marc began to cry because he did not want to kill his grandfather. Defendant and Marc argued for over an hour on the telephone.

At 7 a.m. the next morning, Marc went to Bradshaw's warehouse, hid behind a loading dock, and waited. Bradshaw drove up and entered the warehouse. Marc waited a few minutes, and then went in and talked with his grandfather for about twenty minutes. When Bradshaw turned his back behind the sales counter, Marc shot him twice. Defendant had told Marc to make the murder look like a robbery, so Marc pulled out Bradshaw's pockets, took the money from his wallet, and scattered his credit cards. Marc then took a cab back to the hotel and retrieved his belongings. He went to the airport and flew home.

When Marc told defendant about shooting Bradshaw, she said "Thank God" and hugged and kissed him. Marc gave the gun and shells to defendant, who took them to Behrens' apartment. Defendant gave the gun to Behrens to avoid its discovery in the event the police obtained a search warrant for her apartment.

After Bradshaw was killed, defendant, by court order, received a temporary family living allowance of $3,000 per month and later $5,000 per month from Bradshaw's estate. Defendant did not inherit under Bradshaw's will.

## I. ACCOMPLICE TESTIMONY

Defendant's first point on appeal is that the testimony of Marc Schreuder, an admitted accomplice of defendant's, was uncorroborated and thus insufficient to support defendant's conviction.

At the time of Franklin Bradshaw's murder on July 23, 1978, Utah law provided:

A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimo-

ny of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient, if it merely shows the commission of the offense or the circumstances thereof.

U.C.A., 1953, § 77–31–18 (Repl. Vol. 8C 1978 ed.). Subsequent to the murder but before defendant's trial in late September 1983, the Utah legislature repealed this section and enacted a new section 77–31–18 (Repl. Vol. 8C 1978 ed. Supp.1979), which provided that "[a] conviction may be had on the uncorroborated testimony of an accomplice." This section has been recodified at U.C.A., 1953, § 77–17–7 (Repl. Vol. 8C 1982 ed.).

██ Before the trial, defendant made a motion to require that the accomplice corroboration statute be followed at defendant's trial since it was the statute in effect at the time of the murder. The trial court granted the motion and ruled that application of section 77–17–7 at defendant's trial would be an *ex post facto* application prohibited by article I, section 9, clause 3 of the United States Constitution and article I, section 18 of the Utah Constitution. We agree.

It has been generally held and is well settled that:

> any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.[1]

██ Statutory changes in the mode of trial or the rules of evidence which operate only in a limited and insubstantial manner to a defendant's disadvantage are not pro-

hibited.[2] However, statutes which "alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed" are *ex post facto* when applied in prosecuting crimes committed prior to the statute's passage.[3]

Here, the repeal of the corroboration statute and subsequent passage of the statute providing that a conviction can be had on the uncorroborated testimony of an accomplice reduced the amount of proof necessary for conviction. This Court consistently held when interpreting former section 77–31–18 (Repl. Vol. 8C 1978 ed.) that a defendant could not be convicted solely on the uncorroborated testimony of an accomplice. If uncorroborated accomplice testimony was the sole evidence against a defendant, the defendant had to be acquitted.[4] Thus, applying current section 77–17–7, which was passed after the crime was committed, would lessen the amount of proof necessary to convict defendant and thereby deprive defendant of a substantial right that the law gave her at the time of the murder. Therefore, application of section 77–17–7 would fall within the classes of changes prohibited by the *ex post facto* clause.[5]

██ Thus, we must determine whether there was testimony corroborating that of Marc Schreuder, an admitted accomplice of defendant. The corroboration need not go to all the material facts as testified to by the accomplice or be sufficient in itself to support a conviction.[6] It must only connect the defendant with the commission of the offense and be consistent with his guilt and inconsistent with his innocence.[7]

The testimony of four witnesses, Marc Schreuder, Richard Behrens, Myles Man-

---

1. *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed.2d 216 (1925). *See also Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977).

2. *Beazell*, 269 U.S. at 170, 46 S.Ct. at 68–69.

3. *Hopt v. Utah*, 110 U.S. 574, 589, 4 S.Ct. 202, 209, 210, 28 L.Ed. 262 (1884).

4. *E.g., State v. Somers*, 97 Utah 132, 134, 90 P.2d 273, 274 (1939); *State v. Lay*, 38 Utah 143, 146, 110 P. 986, 987–88 (1910).

5. *See Government of Virgin Islands v. Civil*, 591 F.2d 255, 259 (3d Cir.1979).

6. *State v. Kerekes*, 622 P.2d 1161, 1167 (Utah 1980).

7. *Id.*

ning, and Vittorio Gentile, connects defendant with the murder of Franklin Bradshaw. Marc Schreuder was an admitted accomplice. His testimony clearly established defendant as the person who knowingly and intentionally planned the murder of Bradshaw and who ordered Marc to commit the murder. Marc's testimony also established the motive, pecuniary gain in the form of an inheritance. Thus, Marc's testimony established evidence of all of the elements of the crime of first degree murder. However, because of the applicability of former section 77–31–18 to this case, Marc's testimony must be corroborated. The question then is whether the testimony of any of the other three witnesses corroborated Marc's testimony and, if so, whether any corroborating witness was an accomplice of defendant.

Vittorio Gentile, defendant's former husband, testified that defendant told him during the spring of 1978 that she was going to put out a contract on her father's life. Myles Manning testified that defendant paid him $5,000 in the fall of 1977 to kill her father. Her stated purpose was to collect her inheritance. Manning did not carry out the assignment and had not intended to do so.

Defendant admits that neither Gentile nor Manning was an accomplice to this crime. The testimony of each of these men tends to establish that defendant wanted her father killed. Manning's testimony establishes that she actually planned to do so and that her purpose was to benefit financially. Thus, the testimony of both Gentile and Manning connects defendant with the crime and is consistent with defendant's guilt and inconsistent with her innocence.

Richard Behrens, a friend of defendant for approximately fifteen years prior to the murder, testified that in the late summer of 1977 defendant told Behrens that her support and her inheritance had been cut off by her father and that she wanted to kill him. Defendant repeated this line of thought several times to Behrens. Behrens testified that he did not at first take these comments seriously. Later, however, defendant asked Behrens if he knew someone who would kill Franklin Bradshaw. Behrens introduced defendant to Myles Manning, an acquaintance of Behrens, and arranged several meetings between Manning and defendant. Behrens did not participate in the conversations between the two and did not know what arrangements, if any, had been made between them.

Later that fall, defendant asked Behrens to get a gun for her to be used to kill her father. Behrens made some inquiries but did not acquire a gun or attempt to purchase one. Behrens testified that it was very easy to procure a gun in New York City.

On the evening of July 23, 1978, defendant arrived at Behrens' apartment with a gun which defendant told Behrens had been used by Marc to kill Bradshaw. Defendant told Behrens to get rid of the gun. Defendant kept the gun at his apartment until October 1980, at which time Behrens gave the gun to Marilyn Reagan, defendant's sister. After Reagan turned the gun over to police, Behrens gave a statement to the police implicating Marc. Soon thereafter, defendant approached Behrens and insisted that he recant that statement. With defendant's help, Behrens fabricated a new story implicating Reagan. Behrens was later charged by the Salt Lake County Attorney's office with tampering with evidence and obstruction of justice. After receiving a grant of immunity in exchange for truthful testimony at trial, the charges were dropped.

Behrens' testimony clearly corroborates much of Marc's testimony and is consistent with defendant's guilt and inconsistent with her innocence. Behrens' testimony established that defendant knowingly and intentionally planned to kill her father for pecuniary gain and in fact executed that plan. Defendant, however, argues that Behrens' testimony does not adequately corroborate Marc's testimony because Behrens himself was an accomplice.

■ The test for determining whether a person is an accomplice to a crime is wheth-

er the person could be charged with the same offense as the defendant.[8] Prior knowledge does not make a person an accomplice when that person does not have the mental state required and does not solicit, request, command, encourage, or intentionally aid in perpetration of the crime.[9]

██ Behrens clearly had been told by defendant that she was planning to murder her father. However, Behrens did not intentionally aid or encourage defendant in her plans or have the mental state required for the commission of murder. In fact, Behrens testified that he did not take defendant's comments seriously for some time because becoming overexcited about life's incidents was part of defendant's personality. Defendant, however, claims that because Behrens introduced her to Manning and attempted to procure a gun for her he intentionally aided her in her crime. This argument is without merit. Merely introducing one acquaintance to another, without more, is not sufficient to constitute intentional aid of the magnitude to charge a defendant with first degree murder. Here, Behrens did not participate in discussions with defendant and Manning and did not know what arrangements, if any, were made between them. In any event, if in fact a murder was arranged, it was not carried out by Manning.

Further, making half-hearted attempts to procure a gun without doing so does not constitute intentional aid. Uncontradicted testimony indicated that it was extremely easy to obtain a gun in New York City. Had Behrens truly intended to obtain a weapon to assist defendant in her plans, he surely could have done so.

Finally, Behrens had no part in the sequence of events that finally culminated in Franklin Bradshaw's murder. Uncontradicted testimony indicated that Behrens did not know of the particular plot that result-

ed in Bradshaw's murder until after the event.

Thus, Behrens could not have been charged with first degree murder. While he could have been charged with something, including obstruction of justice[10] or tampering with the evidence for concealing the murder weapon,[11] there was insufficient evidence to establish that he intentionally aided defendant in the murder of Franklin Bradshaw or had the mental state required to commit the crime. Since Behrens could not be considered an accomplice, his testimony was sufficient to corroborate Marc's testimony and connect defendant with the crime. In fact, Behrens' testimony independently established each of the elements needed to convict defendant of first degree murder.

## II. JURY INSTRUCTIONS

██ Defendant next contends that the trial court erred by giving the following paragraph as part of the instruction on accomplice testimony:

Where the testimony is corroborated by other evidence the testimony of an accomplice is entitled to the same consideration as you would give to any other witness. The fact that a person is an accomplice to a crime is no evidence that he is not a credible witness and is no reason for rejecting his testimony. However, you should weigh his testimony as you would weigh the testimony of any other witness and may take into consideration any bias, interest, or any probable motive or lack of motive to testify fairly.

Defendant complains that the judge should not have instructed the members of the jury that they should weigh the testimony of an accomplice just as they would weigh the testimony of any other witness. This argument is without merit.

---

**8.** *E.g., State v. Smith,* 706 P.2d 1052, 1055 (Utah 1985); *State v. Berg,* 613 P.2d 1125, 1126 (Utah 1980).

**9.** *See* U.C.A., 1953, § 76–2–202 (Repl. Vol. 8B 1978 ed.). *See also Kerekes,* 622 P.2d at 1166.

**10.** *See* U.C.A., 1953, § 76–8–306 (Repl. Vol. 8B 1978 ed.).

**11.** *See* U.C.A., 1953, § 76–8–510 (Repl. Vol. 8B 1978 ed.).

In order to determine whether an instruction is proper, the instruction must be read as a whole. When read in that fashion, it is clear that the instruction was not improper. The challenged paragraph first points out that in a case such as the instant one where accomplice testimony has been corroborated by other evidence, accomplice testimony may be viewed as would that of any other witness. In other words, the instruction explains that the fact that a witness is an accomplice is not a reason for rejecting that witness's testimony. The jury should view an accomplice's testimony as it would any other testimony, taking into account "bias, interest or any probable motive or lack of motive to testify fairly." The intent of the instruction is clear: If the jurors feel that an accomplice has a reason to lie, the jurors should consider that in weighing his or her testimony, but should not reject accomplice testimony on the ground of its source alone where there is corroborating evidence. This is certainly a proper instruction under former section 77–31–18 (Repl. Vol. 8C 1978 ed.) (repealed 1979).

■ Defendant also argues that the trial court erred by refusing to give the last sentence of the following instruction:

> You are instructed that three witnesses, Marc Schreuder, Richard Behrens and Myles Manning have each been granted immunity from prosecution for various crimes. You are to view their testimony with the utmost scrutiny and caution.[12]

While it is true that this Court has said that the uncorroborated testimony of an accomplice should be viewed with suspicion,[13] the trial judge was well within his discretion in refusing to give the caution-

ary portion of the instruction. Only Marc Schreuder was an accomplice to defendant's crime. As discussed previously, his testimony was corroborated. Thus, section 77–17–7(2) does not come into play.[14] Further, Marc had not received immunity from prosecution for testifying against his mother. He had already been convicted of second degree murder and sentenced. Finally, neither Behrens nor Manning was an accomplice to first degree murder. Although each received immunity from prosecution for other crimes in exchange for their testimony, a grant of immunity for other crimes does not require a specific instruction that the immunized witness's testimony should be viewed with suspicion. The trial court properly advised the jurors that in weighing the testimony, they should consider the fact that Marc, Behrens and Manning had all received promises in exchange for their testimony in weighing the testimony. (See footnote 12.) In a separate instruction, the judge also instructed the jurors that they should weigh bias, interest, and other factors in their evaluations of witness testimony. Under the circumstances of this case, refusal to give defendant's requested instruction was not error.

## III. EXPERT WITNESS

Defendant's third point on appeal is that the trial court erred by allowing Dr. Louis Moench to testify. Defendant argues that Dr. Moench's testimony improperly placed evidence of defendant's character before the jury, Utah R.Evid. 404; that the probativeness of the testimony was substantially outweighed by the danger of unfair prejudice, Utah R.Evid. 403; and that testimony regarding Marc's statements to Dr.

---

12. The instruction actually given, No. 18, read:
    You are instructed that Marc Schreuder, Richard Behrens and Myles Manning have received certain promises from the prosecutor in exchange for their testimony. You may consider this fact in weighing the credibility of their testimony.

13. *See State v. Wood,* 648 P.2d 71, 91 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). The uncorroborated testimony of an accomplice can be the basis for conviction only under U.C.A., 1953, § 77–17–

7(1) (Repl. Vol. 8C 1982 ed.). As discussed previously, section 77–17–7(1) was not applicable in this trial because it would be an *ex post facto* application.

14. U.C.A., 1953, § 77–17–7(2) (Repl. Vol. 8C 1982 ed.) states:
    In the discretion of the court, an instruction to the jury may be given to the effect that such uncorroborated testimony should be viewed with caution, and such an instruction shall be given if the trial judge finds the testimony of the accomplice to be self-contradictory, uncertain or improbable.

Moench was inadmissible hearsay, Utah R.Evid. 803.

Dr. Moench was originally requested by defense counsel for Marc to interview Marc before his trial and to provide defense counsel with an opinion concerning Marc's state of mind at the time of the murder. Dr. Moench testified at Marc's trial that it was his professional opinion Marc was probably not suffering from any mental illness or defect at the time of the murder, but that Marc was operating under extreme influence from his mother and suffered from an Oedipus complex.

Prior to defendant's trial, defendant made a motion *in limine* to exclude Dr. Moench's testimony on the ground that his testimony would be based totally on hearsay. The trial court ruled that Dr. Moench could be called to testify, but reserved judgment on the admissibility of any particular testimony. At trial, during Marc's testimony, counsel for the State questioned Marc about Marc's interviews with Dr. Moench. During extensive cross-examination, defendant's counsel questioned Marc concerning Dr. Moench and the reasons for consulting Dr. Moench. Following Marc's testimony, Dr. Moench was called as a witness. When Dr. Moench took the stand, he was qualified as an expert witness without opposition. He then went on to testify about Marc's family history as part of the foundation for his professional opinion on Marc's mental condition at the time of Bradshaw's murder. Counsel for defendant objected several times during this testimony. At no time did counsel offer specific objections on the grounds that defendant's character was improperly put into evidence or that the unfair prejudice to defendant substantially outweighed the probativeness of the testimony.

Rule 103(a) of the Utah Rules of Evidence provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....

■ Thus, in order to preserve a contention of error in the admission of evidence for appeal, a defendant must raise a timely objection to the trial court in clear and specific terms.[15] Where there was no clear or specific objection on the basis of character evidence or unfair prejudice and the specific ground for objection was not clear from the context of the question or the testimony, the theory cannot be raised on appeal. In the instant case, defendant did not raise either objection at any time to the trial court. Further, neither ground for objection was clear from the context. While it certainly can be argued that Dr. Moench's testimony was prejudicial to defendant because it tended to establish defendant's guilt, it is not apparent from the context of the testimony that it was *unfairly* prejudicial.

Further, Dr. Moench's testimony on Marc's family history was clearly being used to establish Marc's motivation to murder his grandfather. Although the testimony implicated defendant, it is clear from the context of the testimony that its purpose was not to expressly establish a trait of defendant's character. Thus, we will not address either of these contentions further.

■ Defendant did, however, object in a timely and specific fashion that Dr. Moench's testimony was based on inadmissible hearsay. Therefore, we do address that contention.

Utah R.Evid. 802 forbids the admission of hearsay evidence[16] except as provided by law or by the Rules of Evidence. Utah R.Evid. 803 and 804 provide the exceptions

---

15. *See State v. McCardell,* 652 P.2d 942, 947 (Utah 1982). *See also State v. Malmrose,* 649 P.2d 56, 58 (Utah 1982).

16. "Hearsay" is defined in Utah R. Evid. 801.

to the hearsay rule. The State claims that Dr. Moench's testimony was admissible under Rule 803(4). Rule 803(4) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Utah R.Evid. 803(4) was adopted verbatim from the Federal Rules of Evidence, Rule 803(4).[17] As noted in the preliminary note of the committee to modify the Utah Rules of Evidence, "reference to the notes of the Advisory Committee to the Federal Rules of Evidence is pertinent to the meaning and effect of these rules. . . ." U.C.A., 1953, Utah R.Evid. (Repl. Vol. 9B 1977 ed., Supp.1986).

The advisory committee note on proposed Federal Rule of Evidence 803(4) states in pertinent part:

> Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify. While these statements were not admissible as substantive evidence, the expert was allowed to state the basis of his opinion, including statements of this kind. The distinction thus called for was one most

unlikely to be made by juries. The rule accordingly rejects the limitation. This position is consistent with the provision of Rule 703 that the facts on which expert testimony is based need not be admissible in evidence if of a kind ordinarily relied upon by experts in the field.[18] The rule was adopted verbatim by Congress.[19]

Thus, Fed.R.Evid. 803(4), as well as Utah R.Evid. 803(4), specifically abolished the distinction between the physician who is consulted for the purpose of treatment and one who is consulted only in order to testify as a witness. Statements made to a physician specifically for the purpose of enabling him or her to testify at trial can be admissible under this rule.[20]

Furthermore, Fed.R.Evid. 803(4) and Utah R.Evid. 803(4) specifically abolished the distinction between a physician repeating a patient's statement for the limited purpose of explaining the basis of an opinion and repeating the statement to prove the truth of the out-of-court declarations.[21]

Finally, Utah Rule 803(4) adopts a position consistent with Utah R.Evid. 703. Rule 703 provides that the facts upon which expert testimony is based need not be admissible if of a kind ordinarily relied upon by experts in their particular field. Rule 703 assumes that the particular facts relied on will be trustworthy because the integrity and specialized skill of the expert will keep him or her from basing his or her opinion upon questionable matter. The right to cross-examine the expert reinforces the probability of reliability.[22] Thus, the test

---

**17.** *See* Committee Note to Rule 803, Utah R.Evid. (Repl. Vol. 9B 1977 ed., Supp.1986).

**18.** Notes of Advisory Committee on Proposed Rules, 28 U.S.C.A. Rule 803, at 279 (West 1984).

**19.** *See* Historical Note, 28 U.S.C.A. Rule 803, at 273 (West 1984).

**20.** *See United States v. Iron Shell,* 633 F.2d 77, 83 (8th Cir.1980); 11 J. Moore & H. Bendix, Moore's Federal Practice § 803(4)[7] (1985) (hereinafter cited as Moore's Federal Practice); 4 J. Weinstein & M. Berger, Weinstein's Evidence § 803(4)[01] at 803–146 (1985) (hereinafter cited as Weinstein's Evidence).

**21.** The Eighth Circuit Court of Appeals in *Iron Shell,* 633 F.2d at 83 n. 8, noted:

> Some courts had also held that a physician could repeat a patient's statement regarding medical history or past symptoms for the limited purpose of explaining the basis of an opinion and not in order to prove the truth of the out-of-court declarations. This distinction was likewise rejected by the federal rules. (Citation omitted.) *See also O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1089 (2d Cir.1978).

**22.** Weinstein's Evidence, *supra* note 20, at 803–146.

for admissibility of statements made for the purpose of medical diagnosis under Rule 803(4) is the same as that for Rule 703: Is this particular fact one that an expert in this particular field would be justified in relying upon in rendering his opinion?

Rule 803(4) applies to statements made to a psychiatrist or a psychologist for the purpose of medical diagnosis or treatment as well as statements made to other medical doctors.[23] Generally, all statements made to psychiatrists or psychologists, regardless of content, are relevant to diagnosis or treatment since experts in the field view everything relating to the patient as relevant to the patient's personality.[24]

In this case, the trial judge allowed Dr. Moench to relate the bases upon which he formed his opinion of Marc. Dr. Moench briefly related the family history as told to him by Marc. He also stated that he had partially based his opinion on observations of Marc and on a tape provided to him of a conversation between defendant and her daughter Lavinia. The trial judge tightly controlled Dr. Moench's testimony. Dr. Moench was not allowed to repeat statements by defendant that Marc repeated to Dr. Moench, with one minor exception, or divulge the contents of the tape. Dr. Moench was simply allowed to state the basis for his expert opinion and that opinion. On cross-examination, Dr. Moench was incisively cross-examined. Among other things, defense counsel questioned Dr. Moench as to Marc's motivation for consulting the psychiatrist, the possibility that Marc lied in order to influence Dr. Moench's diagnosis and shift the blame to defendant, and the psychiatric capability of diagnosing a person several years after the event. However, defendant contends on appeal that Dr. Moench's testimony should not have come in because it did not meet the indicia of reliability necessary to allow admission of this type of testimony.

Dr. Moench's testimony came well within the exception provided by Rule 803(4). A psychiatrist is perfectly aware of the fact that any history obtained from a patient may be distorted and self-serving.[25] However, a psychiatrist is specifically trained to "assimilate information from a wide variety of sources, to evaluate each fact, to discount some, to emphasize others, and to ignore still others. He then makes his own personal observations of his patient, puts everything together, and arrives at a conclusion."[26] Both the standards of the profession and a clinician's professional experience combine to form a basis upon which the psychiatrist can determine which clinical facts are pertinent to a professional opinion. Any flaws or failures in that examination or in the bases of the opinion can then be pointed out by incisive cross-examination. But the cross-examination gains in incisiveness and pertinency proportionally to the freedom accorded the psychiatrist to tell the whole story.

Finally, and most importantly, the fact finder must be given the opportunity to make an informed judgment concerning the weight to be given the expert opinion. Preventing a psychiatrist from testifying about the bases of his expert opinion vastly increases the danger of insulating the psychiatrist from scrutiny and misleading the jury with conclusory statements.[27] Only when the bases for an expert's opinion are stated can cross-examination be relied on to

**23.** *United States v. Lechoco*, 542 F.2d 84, 89 n. 6 (D.C.Cir.1976). *See Howe v. State*, 611 P.2d 16, 19–20 (Alaska 1980). *See also* Moore's Federal Practice, *supra* note 20, at VIII–108; Weinstein's Evidence, *supra* note 20, at 803–150; Quinn, *Hearsay in Criminal Cases Under the Colorado Rules of Evidence: An Overview*, 50 U.Colo.L. Rev. 277, 316 (1979); Annot., 55 A.L.R.Fed. 689, 699–700 (1981).

**24.** Weinstein's Evidence, *supra* note 20, at 803–150.

**25.** Diamond & Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations & Speculations*, 63 Mich.L.Rev. 1335, 1353 (1965).

**26.** *Id.*

**27.** Bonnie & Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 Va.L.Rev. 427, 511 n. 250 (1980).

expose any unreliability in such information bases.

A psychiatrist or a psychologist of course cannot be made a conduit for testifying in court as to any and all out-of-court statements made.[28] As with admission of evidence of any kind, great discretion is accorded the trial judge in the determination of admissibility. The trial court must, as with any evidence, assess the inherent reliability of the testimony, the relevance of the testimony, and undertake a balancing test, particularly of prejudice versus probativeness under Rule 403. Furthermore, the trial court has discretion to admit any testimony for limited purposes only. Only where the trial court abuses that discretion will this Court step in. No such abuse is present here.

Defendant, however, also contends that allowing Dr. Moench to repeat what Marc told him denied defendant her right to confrontation. This contention has no merit. The United States Supreme Court has stated that "where the declarant is not absent, but is present to testify and to submit to cross-examination ... the admission of his out-of-court statements does not create a confrontation problem" under the federal constitution.[29] The rule under the state constitution is no different.[30]

Marc was available to testify and, in fact, did testify before Dr. Moench testified. In substance, Marc repeated on the stand all of the family history later related by Dr. Moench as the basis for his expert opinion. Marc was questioned by the State concerning his reasons for consulting Moench and the content of his discussions with Dr. Moench. Counsel for defendant cross-examined Marc, particularly regarding the reasons Marc consulted Dr. Moench. Defense counsel also had available the transcript of Dr. Moench's testimony at Marc's

trial and knew the substance of Dr. Moench's prospective testimony. Finally, under Utah R.Evid. 806, defense counsel could have recalled Marc to the stand and cross-examined him concerning any statements he made to Dr. Moench.

Thus, since Marc was in court and subject to cross-examination, the essence of the confrontation right appears to have been satisfied.

## IV. JURY SELECTION

Defendant's next point on appeal is that the exclusion for cause of one venirewoman who expressed a conscientious objection to the death penalty in a capital case denied defendant her right to an impartial and representative jury on the issue of guilt. U.S. Const. amend. VI, XIV.

U.C.A., 1953, § 77–35–18(e)(10) (Repl. Vol. 8C 1982 Ed.) provides that jurors may be challenged for cause as follows:

(e) The challenge for cause is an objection to a particular juror and may be taken on one or more of the following grounds:

. . . .

(10) If the offense charged is punishable with death, the entertaining of such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction regardless of the facts. . . .

A venireman may be excused for cause if his scruples are such that as a juror he could not impose the death penalty.[31] Further, as noted in *State v. Moore* [32], the practice of death qualifying the jury has been employed in Utah and sustained by this Court. However, in *State v. Norton* [33], the Court held that the trial court must also ask the prospective jurors if they would

---

**28.** See *Kallas v. Kallas,* 614 P.2d 641, 644 (Utah 1980).

**29.** *California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970).

**30.** See *State v. Anderson,* 612 P.2d 778, 785 (Utah 1980).

**31.** *State v. Moore,* 697 P.2d 233, 237 (Utah 1985).

**32.** *Id.*

**33.** 675 P.2d 577, 588–89 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984).

automatically vote for the death penalty upon a conviction of first degree murder.

In the instant case, the trial judge asked each prospective juror whether he or she could be impartial during the guilt phase and whether, upon a conviction of first degree murder, he or she would automatically impose the death penalty. One prospective juror replied that he would impose the death penalty in all first degree murder cases, regardless of the facts, and that he had already formed an opinion as to defendant's guilt. On defendant's motion, the judge excused that venireman for cause.

In *Moore*, the Court rejected a claim of error similar to defendant's in the instant case. The Court in *Moore* said that any prejudice arising from the exclusion of potential jurors who would never impose the death penalty is counterbalanced by the requirement that the trial court also excuse for cause any prospective juror who would automatically vote for the death penalty upon a conviction of first degree murder. Since the trial court there individually asked each juror both questions and no evidence appeared from the record of bias in favor of either party, this Court found no error.

*Moore* controls in the instant case. The trial court asked each juror about possible biases. Prospective jurors from both ends of the spectrum were dismissed for cause. Further, nothing in the record indicates that any members of the final jury panel were biased in favor of the prosecution or against the defendant. Rather, the evidence indicates selection of a jury determined to be fair and impartial with no predilection for imposition of the death penalty. The defendant's contention of error on this point, therefore, has no merit.

## V. INSUFFICIENCY OF THE EVIDENCE

Defendant's next point on appeal is that the evidence adduced by the State at trial was insufficient to establish that de-

fendant caused her father's death for pecuniary or personal gain. Defendant was convicted under U.C.A., 1953, § 76-5-202(1)(f) (Repl. Vol. 8B 1978 ed.) (amended 1983), which states:

> Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:
>
> . . . .
>
> (f) The homicide was committed for pecuniary or other personal gain.

A conviction will be reversed for insufficiency of the evidence "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted."[34]

The evidence in this case is clearly sufficient to sustain a conviction of first degree murder. The evidence and all of the inferences that can be reasonably drawn from it, when viewed in the light most favorable to the jury verdict, establish beyond a reasonable doubt that defendant had her father murdered for the purpose of gaining financially. Marc Schreuder, Richard Behrens, and Myles Manning all testified that defendant wanted her father murdered because Franklin Bradshaw had cut defendant off financially, and she wanted to get her inheritance.

Defendant, however, argues that because defendant did not actually inherit under the terms of Franklin Bradshaw's will, the murder could not have been committed for pecuniary or personal gain. This contention is without merit. The clear language of the statute indicates that in order to be convicted of first degree murder under subsection (1)(f), a defendant must intentionally or knowingly cause the death of another person with the intent to gain personally or pecuniarily. The fact that a defendant does not so gain is irrelevant. It is the intent and belief which controls.

---

**34.** *E.g., State v. Petree,* 659 P.2d 443, 444 (Utah 1983) (citation omitted).

In the instant case, the evidence indicates that defendant believed that she would inherit under Franklin Bradshaw's will and that she had Bradshaw murdered to get that inheritance. The fact that defendant misapprehended the terms of the will, which gave everything to Berenice Bradshaw, does not change defendant's intent. Therefore, the evidence was sufficient to convict defendant of first degree murder.

## VI. PROSECUTOR MISCONDUCT

■ Defendant's final point on appeal is that due to prosecutor misconduct defendant was denied due process of law. Defendant cites three instances which she claims constitute misconduct. Defendant first argues that the prosecutor knowingly introduced perjured testimony when he elicited testimony from Marc that no promises had been made to him in exchange for his testimony when, in fact, the prosecutor: (1) had agreed to report to the parole board that Marc had testified at trial and that it was the prosecutor's opinion that he had testified truthfully; and (2) had agreed not to use Marc's testimony at defendant's trial against him at his retrial if his conviction was reversed on appeal.

The facts that are pertinent to this contention are as follows: On direct examination, the prosecutor asked Marc, "Has there been any promises made to you in exchange for your testimony?" Marc answered, "No, there haven't." On cross-examination, the following exchange took place:

Q. [by Mr. Rosen] Hasn't the prosecutor promised to communicate on your behalf to the parole board, sir?

A. Yes, they have.

Q. And the prosecutor, Mr. Jones, has told you that after you are through testifying here against Mom he's going to send a letter to the parole board about you, isn't he? That's what he promised you?

A. No, it's not.

Q. Didn't he say he would communicate with the parole board about you?

A. Yes, he did.

Q. You don't consider that some sort of promise?

A. I don't know what to consider it.

Q. Did he promise you to communicate to the parole board?

A. Yes, he did.

Q. As you sit here today, sir, do you have an expectation that maybe the prosecutor's communication to the parole board will get you out of jail a little earlier than they are going to let you out?

A. Perhaps.

On redirect, Marc testified as follows:

Q. [by Mr. Jones] One last question, Marc. You were asked on cross-examination about any promises or deals in exchange for your testimony.

A. No kind of promises except that you will appear at the parole board.

Q. And did anyone ever promise you that if you testified your sentence would be reduced?

A. No.

Q. Has anyone ever promised if you testify, you're going to be released from prison early?

A. No.

Q. In exchange for the appearance or the representation to the board what are you expected to do?

. . . .

A. Well, I am expected to tell the truth here in court today, to tell the truth as it happened about this whole thing.

Q. Are you doing that?

A. Yes, I am.

It is clear from the above exchanges that both Marc and the prosecutor considered Marc's original answer that no promises had been made to him in exchange for his testimony to have been a truthful answer. Thus, this testimony could not have been knowing use by the State of perjured testimony.

The day after the above testimony was given, Marc telephoned his attorney and Mike George, an investigator for the Salt Lake County Attorney's office, and asked both if there hadn't been a second agreement made at the urging of Marc's attorney immediately before Marc went on the stand. Marc said he had forgotten about it because he had not shared his attorney's concern but was concerned that his omission would be misinterpreted. The agreement was not to use the testimony Marc gave at defendant's trial against Marc at a subsequent trial if Marc's conviction was reversed on appeal. The trial court was immediately contacted and the situation explained. The judge, upon stipulation of counsel for both the State and defendant, informed the jury of the omission.

This Court has said that the State's knowing use of perjured testimony would violate a defendant's right to due process "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." [35] This is true even when the State does not intentionally solicit the false evidence, but merely allows it to go uncorrected when it appears.[36]

Felony perjury is committed by a witness on the stand when he makes a false material statement under oath or affirmation and does not believe the statement to be true.[37] It is thus to be seen that Marc's testimony that he was not induced to testify by reason of promises made does not constitute perjury, nor could it have affected the judgment of the jury. To the contrary, by virtue of the cross-examination and redirect examination of Marc and by the judge's specific admonition, the jury was fully apprised of all promises made. Notwithstanding the promises made, Marc further testified that he was expected to tell the truth and that he in fact did testify truthfully.

During closing argument, the prosecutor again pointed out the omissions in Marc's testimony on direct examination, arguing that the promises made were so insignificant as to be irrelevant to Marc's decision to testify. Thus, the jury had all of the facts before it and was fully capable of weighing both those facts and the credibility of the witness.[38]

Defendant also contends that the prosecutor made repeated efforts to introduce inadmissible testimony in disregard of trial court rulings deeming the evidence inadmissible. This contention has no merit. The trial court ruled that evidence of statements made by Franklin Bradshaw concerning proposed changes in his will would be inadmissible unless the State could establish a proper foundation that defendant was aware of the proposed changes. The prosecutor attempted to lay that foundation. The trial court sustained defendant's objections to the State's line of questioning whenever those objections were proper. While the prosecutor attempted to lay the foundation with several witnesses, he did not in any fashion overstep the bounds of proper conduct.[39]

Defendant finally contends that the cumulative effect of all the errors that took place at trial mandate that defendant's conviction be reversed. As discussed heretofore, we do not note any error. The conviction and judgment are therefore affirmed.

DURHAM, Justice (concurring separately).

I respectfully submit that Justice Stewart's concurring opinion and to some extent the majority opinion had misdirected their

---

35. *State v. Shabata,* 678 P.2d 785, 789 (Utah 1984) (citations omitted); *Walker v. State,* 624 P.2d 687, 690 (Utah 1981).

36. *Shabata,* 678 P.2d at 789; *Walker,* 624 P.2d at 690.

37. *See* U.C.A., 1953, §§ 76–8–501 to –502. (Repl. Vol. 8B 1978 ed.).

38. Defendant also implies that some of the State's contacts with Marc prior to trial were improper and, indeed, the conduct does project the appearance of impropriety. However, the issue was not raised as a point on appeal.

39. *See State v. Sullivan,* 6 Utah 2d 110, 115, 307 P.2d 212, 216, *cert. denied,* 355 U.S. 848, 78 S.Ct. 74, 2 L.Ed.2d 57 (1957).

analysis of the admissibility of Dr. Moench's testimony.

The majority opinion correctly concludes that the defendant failed to object to the admission of the testimony on the basis of Rules 403 and 404 and is therefore precluded from arguing that theory on appeal. However, since I believe Dr. Moench's testimony did not contain hearsay, given the purpose for which it was offered, I think the analysis of that question by both the majority and Justice Stewart is superfluous. Moreover, the opinions are confusing in failing to identify precisely the content and purpose of the testimony the majority approves and Justice Stewart finds objectionable.

Dr. Moench's testimony repeats statements made to him by Marc Schreuder about Frances Schreuder and events in their family history. Dr. Moench referred to statements made by Frances only indirectly, as in the following example:

> [I]f [Marc] didn't do everything to please [Frances], she would threaten to lock him out, threaten to disown him and repeatedly told him that they would be disowned, that they would be thrown out of their apartment, that they would wind up in Harlem living in the gutter. That she and Lavinia would starve if Marc didn't do everything she said to.

There are thus two types of statements at issue here: those made out of court by Frances, repeated by Marc to Dr. Moench and described at trial, and those made out of court by Marc and repeated by Dr. Moench at trial. I submit that neither type of statement was hearsay under our rules. Frances' out-of-court statements were not hearsay because they were not "offered in evidence to prove the truth of the matter asserted." Utah R.Evid. 801(c). That is, they were not offered to prove that Frances and Lavinia would starve or that the family would be disowned. It is clear that they were offered merely to prove that they were made. Just as Marc could testify without any hearsay problem, for example, that his mother raised her voice or opened a window, he may testify as to what he heard her say if the testimony is not offered to show that what she said was true.

Marc's out-of-court statements, as distinguished from Frances', were not hearsay because they were offered pursuant to Rule 801(d)(1)(B) to rebut implications raised by the defense that Marc's trial testimony was improperly influenced or motivated. As indicated by the majority opinion, Marc testified at the trial about his family history and his relationship with his mother. His testimony was subject to cross-examination, and a strenuous attack was made on his credibility. The statements made by Marc to Dr. Moench corroborated the consistency of Marc's version of events over time, tending to rebut the implication that he had fabricated his testimony or had an improper motive for giving it at Frances' trial.[1] That Marc's testimony seems inherently unreliable, as the dissent asserts, would be grounds for the jury to disbelieve it, but not grounds in this context for the trial court to reject it. See *State v. Speer*, 718 P.2d 383 (Utah 1986).

If the foregoing analysis is accurate, there is no need to address the admissibility of Dr. Moench's testimony under the hearsay/expert opinion rule at all. The defendant's brief focuses only on the out-of-court statements of Marc and Frances, not on the expert opinion Dr. Moench offered. Those statements were not hearsay. The only possible exception to that conclusion is the possibility that the *scope* of Dr. Moench's testimony exceeded the subject

---

1. Although Dr. Moench testified as part of the State's case-in-chief, that fact does not mean that the testimony regarding Marc's statements was not offered to rebut a charge of improper influence or motive. Direct testimony can function as rebuttal when it is offered in response to attacks made on cross-examination. Here, Marc testified prior to Dr. Moench and was subjected to extensive cross-examination regarding fabrication of testimony, improper influence, and improper motive. By offering Dr. Moench's testimony immediately after Marc's, the State was able to rebut inferences from cross-examination and thereby strengthen its version of events.

matter covered by Marc's trial testimony. If *new* evidence was contained in Marc's statements to Dr. Moench, it would be difficult for the State to sustain the position that Dr. Moench's testimony was simply rebuttal. However, the defense has made no effort to develop this argument or to delineate the material covered by Marc at trial, as opposed to his pretrial communications to Moench. In the event that such a distinction exists, however, and Dr. Moench's testimony did not in every way qualify as nonhearsay under Rule 801(d)(1)(B), the analysis undertaken by the majority opinion correctly disposes, in my view, of any hearsay objection.

ZIMMERMAN, J., concurs in the concurring opinion of Justice DURHAM.

STEWART, Justice (concurring in result).

Although I concur with much of the majority opinion and with the result reached, I disagree with the majority's position that the out-of-court statements that Frances Schreuder allegedly made to her son Marc Schreuder, who related them to Dr. Louis Moench during a psychiatric evaluation prior to Marc's earlier trial for murder, were admissible through Dr. Moench against Mrs. Schreuder. I submit those statements violate the hearsay rule.

## I. CONFRONTATION

The numerous exceptions to the hearsay rule, and sometimes even out-of-court statements defined to be non-hearsay, stand in inherent tension with the constitutional right of confrontation. *See, e.g., Ohio v. Roberts*, 448 U.S. 56, 66 n. 9, 100 S.Ct. 2531, 2539 n. 9, 65 L.Ed.2d 597 (1980). By and large, exceptions to the hearsay rule do not violate the constitutional right of confrontation because they are founded on considerations deemed to provide sufficient reliability to substitute for the oath, cross-examination, and observation of a witness' demeanor. *Ohio v. Roberts, supra*, 448 U.S. at 66, 100 S.Ct. at 2539; *but see, e.g., Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). But evidence that is admissible as an exception to the hearsay rule may still violate the confrontation clause, as the United States Supreme Court has recently reiterated. *Lee v. Illinois*, —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (U.S.1986). *See also Ohio v. Roberts, supra*, 448 U.S. at 65, 100 S.Ct. at 2538. Whether the evidence in question violated Mrs. Schreuder's right of confrontation under the Sixth Amendment of the United States Constitution and Article I, § 12 of the Utah Constitution is a question that need not now be resolved, but the constitutional backdrop of those hearsay issues should not be ignored.

## II. HEARSAY

The majority relies upon the hearsay exception found in Rule 803(4) of the Utah Rules of Evidence, "Statements for purposes of medical diagnosis or treatment," as authority for admitting Dr. Moench's testimony of Marc Schreuder's assertions of his mother's out-of-court statements. The majority also relies upon Rule 703, which permits an expert to testify to a conclusion based in whole or in part on a hearsay foundation if the hearsay is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

This Court has held, even before the adoption of our present rules of evidence, that out-of-court statements made to a psychologist or psychiatrist were admissible to establish the foundation for an opinion as to an examinee's mental state. *Kallas v. Kallas*, 614 P.2d 641, 644–45 (Utah 1980) (statements made to a psychologist); *Lemmon v. Denver & Rio Grande Western Railway*, 9 Utah 2d 195, 200–01, 341 P.2d 215, 218 (1959) (statements made to a psychiatrist). In *Edwards v. Didericksen*, 597 P.2d 1328 (Utah 1979), we discussed the general rule concerning admissibility of expert opinions based in part on hearsay of a kind that is used regularly in the expert's trade or profession, but we also warned against the impropriety of using an expert merely as a conduit to place otherwise inadmissible hearsay before a jury.

Under the most recent version of our rules of evidence, which were adopted in 1983 and follow generally the Federal Rules of Evidence, the hearsay exception for out-of-court statements made to a physician for medical purposes has been expanded. That exception, contained in Rule 803(4), now admits a declarant's out-of-court statements to a physician, whether for diagnosis or treatment of the declarant. Although a patient's "history" may be helpful in making a diagnosis, a "history" cannot be made a conduit for the admission of all kinds of hearsay, especially to establish the truth of some proposition of fact about a third person. The patient's declarations are admissible only for the purpose of diagnosis or treatment; that is as far as the rationale for the rule extends.

Assuming that Rule 803(4) applies in the instant case, a psychiatrist or psychologist should be allowed to testify to statements made to him by a patient, but only to establish the patient's character, personality traits, or state of mind, not to establish the truth of a factual proposition about another person. The potential for unreliable evidence is incalculable when a patient reports to a psychiatrist or psychologist the declarations of a third person and those declarations are then used to establish the truth of the matter asserted to incriminate the third party. In this case, Dr. Moench's testimony went beyond a "history"; his testimony included statements made by Mrs. Schreuder to Marc that pertained directly to Mrs. Schreuder's guilt.

Whether the evidentiary analysis proceeds under Rule 803(4) or Rule 703, the result should be the same, although there is a difference in the effect of applying the two rules. When hearsay is admitted under Rule 703, it is not admitted for the truth of the matter asserted, but only as a foundation for an expert's opinion. It is generally, although not always, less likely to bear upon the adjudicative facts at issue in the case and more likely to relate to broader concepts and principles which the expert utilizes to form an opinion. Rule 703 should not be construed to allow assertions about a third person to be admitted purportedly to establish a foundation for an expert's opinion, but in reality for the truth value of the assertions against the third person. Under Rule 803(4), the hearsay evidence qualifies as an exception to the hearsay rule and is accepted as evidence of the truth of the matter asserted and usually will bear on the adjudicative facts. For that reason, the Rule 803(4) exception should be confined to its purpose so that the exception does not exceed its rationale and create an expansive loophole for unreliable evidence.

In my view, the admission of Dr. Moench's testimony which referred to what Mrs. Schreuder told Marc Schreuder did not fall within Rule 803(4) or Rule 703. Nevertheless, the errors in this regard were harmless because the evidence of Frances Schreuder's declarations that bore on the important issues in the trial was supported by other cumulative evidence; however, the error should be recognized as such and not dealt with as if no error had occurred.[1]

Finally, Justice Durham's analysis of Marc's testimony as nonhearsay requires a comment. She asserts that it was nonhearsay because it was adduced "to rebut implications raised by the defense that Marc's trial testimony was improperly influenced or motivated." There is no rule that admits what would otherwise be inadmissible hearsay for purposes of rebuttal generally. Certainly, the statements were not admissible as prior consistent statements to rebut an attack of "recent fabrication." In fact, the evidence was not admitted in rebuttal at all; it came in as a part of the prosecution's case in chief. Justice Durham also

---

**1.** The evidentiary issue involves what was double hearsay prior to the adoption of our present rules of evidence. Even though double hearsay is admissible if both aspects qualify under an exception to the hearsay rule, the confrontation issue that is involved still exists. *Cf. Lee v.* *Illinois,* —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (U.S.1986). Furthermore, the confrontation issue, to the extent it may exist in a case, cannot be resolved by the mere redefinition of hearsay as nonhearsay. *See id.*

asserts that Mrs. Schreuder's out-of-court statements were not hearsay because they were not offered for the truth of the matter asserted, but "merely to prove they were made." I disagree. Dr. Moench was allowed to testify, for example, that Marc left Midland, Texas, where he purchased the murder weapon, because of plans and conversations that Marc and Mrs. Schreuder had entered into. That and other statements, one of which was excluded by the trial court, were plainly based on statements Mrs. Schreuder made to Marc.

### III. PROSECUTOR MISCONDUCT

The record discloses what I think was clearly improper conduct on the part of the prosecutor. When Marc Schreuder was on the stand as a prosecution witness, he testified that the prosecution had made no promises to him; *and the prosecution allowed that statement to stand.* In fact, that testimony was false. The prosecutor had promised to appear with Marc at his first Board of Pardons appearance. Marc was also promised immunity from prosecution for any crimes to which he admitted. Notwithstanding the prosecutor's conduct, Marc's perjurious statements were eventually cleared up on cross-examination by *defense counsel,* and therefore form no basis for reversal. However, the prosecutor's conduct appears to have violated Disciplinary Rule 7–102(A)(4) of Rule IV of the Revised Rules of Professional Conduct of the Utah State Bar. *Cf. Nix v. Whiteside,* — U.S. —, 106 S.Ct. 988, 89 L.Ed.2d 123 (U.S.1986).

In addition, prior to trial an investigator from the Salt Lake County Attorney's office had Marc released from prison and took him to a hotel to visit his father and also took Marc and his girlfriend to a movie and to the University of Utah where she was to be inducted into an honor society. I submit that the extraordinary treatment afforded Marc by the prosecution was wrong, as was the prosecution's failure to disclose to the court Marc Schreuder's false testimony.

HOWE, J., concurs in the concurring opinion of Justice STEWART.

